## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| YELLOW CORPORATION, YRC INC. (d/b/a YRC FREIGHT), USF HOLLAND LLC, NEW PENN MOTOR EXPRESS LLC, and USF REDDAWAY INC., | ) ) ) ) ) |
| Plaintiffs, | ) **CIVIL ACTION** ) **CASE NO. _____** ) |
| v. | ) ) |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, TEAMSTERS NATIONAL FREIGHT INDUSTRY NEGOTIATING COMMITTEE, TEAMSTERS LOCAL NO. 696, TEAMSTERS LOCAL NO. 795, and TEAMSTERS LOCAL NO. 41, | ) **JURY TRIAL REQUESTED** ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiffs Yellow Corporation (the "Company"), YRC Inc. (d/b/a YRC Freight), USF Holland LLC ("Holland"), New Penn Motor Express LLC ("New Penn") and USF Reddaway Inc. ("Reddaway") (collectively "Yellow"), for their complaint against defendants International Brotherhood of Teamsters ("IBT"), Teamsters National Freight Industry Negotiating Committee ("TNFINC"), Teamsters Local No. 696 ("Local 696"), Teamsters Local No. 795 ("Local 795"), and Teamsters Local No. 41 ("Local 41," and collectively with Local 696 and Local 795, the "Local Unions") (IBT, TNFINC and the Local Unions, collectively, the "Union"), allege:

## PRELIMINARY STATEMENT

1.      This breach of contract action arises from egregious breaches by the Local Unions and TNFINC of clear and unambiguous provisions of their collective bargaining agreement with the plaintiff affiliated trucking companies—breaches instigated, supported, ratified, and

encouraged by IBT, the international Teamsters union. The breaches, orchestrated by Sean O'Brien, IBT's recently elected General President, have unjustifiably blocked restructuring efforts essential to plaintiffs' survival and success and have already caused plaintiffs over $137 million in damages. If not cured immediately, these breaches will also result in the liquidation of the Company, the loss of 22,000 Teamsters jobs, higher transportation costs in a less competitive freight shipping market, and severe harm to the United States supply chain and economy, as well as wipe out all of the equity value of Yellow's shareholders, including the United States Treasury, Yellow's single largest shareholder.

2.      Yellow, the country's third largest freight carrier in the less-than-truckload ("LTL") sector of the trucking market, in which carriers ship goods from multiple shippers in single trailers, has been engaged in a critical initiative to restructure and modernize its business and upgrade the efficiency of its operations, so that it can compete successfully against centralized and non-unionized trucking companies to which it has steadily and increasingly lost business. That initiative, which the Company calls One Yellow, involves, in carefully planned phases, the merger of Yellow's four operating subsidiaries, YRC Freight, Holland, New Penn, and Reddaway, into a freight carrier that will eliminate inefficiencies, including inefficiencies arising from competition between its subsidiaries for the same jobs, and create a super-regional carrier operating as one company, with one network, under a single Yellow brand.

3.      Under the collective bargaining agreement, the Union is not permitted to impede the One Yellow restructuring. Rather, it is obligated to cooperate with Yellow—including in a contractually stipulated procedure—to resolve employee seniority issues that may arise as a result of the restructuring.

4.     The Union's recent refusal to comply with those contractual obligations marks a reversal from its original conduct in connection with Phase 1 of One Yellow in the western part of the United States. Originally, the Union, in accordance with its contractual obligations to Yellow, cooperated with Yellow in the September 2022 implementation of the first phase of One Yellow to resolve the Phase 1 seniority issues, and that implementation has resulted in a more efficient and successful operation in Yellow's western network.

5.     Now, however, the Union has reversed course and without any justification refuses to comply with its contractual obligations to cooperate with and not impede the implementation of the remaining phases of One Yellow.

6.     Beginning about eight months ago, the Union, at the direction of Sean O'Brien and in breach of its collective bargaining agreement with Yellow, has steadfastly refused to resolve the seniority issues arising from Phase 2—even though the Union and Mr. O'Brien know that obstructing One Yellow would financially destroy the Company, put 30,000 employees, including 22,000 Teamsters, out of work, and badly disrupt the country's supply chain.

7.     Notwithstanding Yellow's repeated approaches to the Union and Mr. O'Brien to meet and negotiate, and its repeated offers to accommodate the Union's purported demands, Mr. O'Brien has refused to permit any cooperation or negotiations, choosing instead to direct profanities at Yellow and its executives and even to gloat at Yellow's impending demise. In fact, for his own inexplicable reasons, political or otherwise—reasons that could not possibly be in the interests of Union members, let alone the country—Mr. O'Brien has made clear that he wants to bring about Yellow's demise. Most recently, he has gone so far as to tweet a picture of a headstone in a cemetery with "Yellow" on it:



8.      Mr. O'Brien sees his calling, not as advancing Union members' interests lawfully, but instead, as described by a recent *Washington Post* profile, seizing a "once-in-a-generation opportunity to push back" against management in corporate America, whom he routinely refers to as "white collar criminals." In that crusade, not only is Yellow a principal target, but its 30,000 employees, including 22,000 Teamsters, and their families are mere collateral damage.

9.      The dispute in this case arises from the Union's breach of the YRCW National Master Freight Agreement covering the period April 1, 2019 through March 31, 2024 and related supplemental agreements[1] (together, the "NMFA") between Yellow and the Union. Under the NMFA, the Union has no contractual (or other legal) right to encumber Yellow's entrepreneurial

---

[1] Supplemental agreements set forth additional terms concerning the specific types of work performed by the various classifications of employees subject to the NMFA. The supplemental agreements generally set forth work rules for Yellow's employees engaged in pickup, delivery, and handling of freight.

control of, and decision-making authority over, its business. When Yellow decides on operational changes, the Union's only role and its obligation is, under contractually prescribed procedures, to work out with Yellow the seniority of those Union members affected by the change.

10.     Yellow's management in 2019 formulated One Yellow to remedy the inefficiencies that plague Yellow's business, as an amalgamation of separate operating subsidiaries, that hamstring its ability to compete in the LTL sector of the trucking market and that have caused decades of the Company losing market share to more operationally nimble non-unionized competitors. Inefficiencies result, for example, from the fact that at most of Yellow's roughly 300 terminals, driving and freight handling are separate tasks performed by different employees. This results in drivers waiting, sometimes for hours, for their trucks to be loaded or unloaded or for trailers to be connected to or disconnected from their tractors, which drastically slows freight movement across Yellow's network, increases costs, reduces revenues, and hinders Yellow's ability to compete with non-unionized companies that can more readily change their drivers' responsibilities to meet customer demand and adapt to changing market conditions.

11.     The completion of One Yellow in 2023 is critical to Yellow's viability, particularly given Yellow's need to refinance its $1.3 billion in debt—a $567.4 million term loan maturing on June 30, 2024, and a $729.4 million U.S. Treasury loan maturing on September 30, 2024—as the Union has long understood, including through its representation on Yellow's Board of Directors. Yellow thus planned to accomplish its restructuring well in advance of the maturity of its debt by, among other things, implementing Phase 1 of One Yellow in September 2022, and planning to implement Phase 2 by the end of December 2022 and Phase 3 shortly thereafter.

12.     To effectuate One Yellow, Yellow was required, under the NMFA, to present to the Union a change of operations ("CHOPS") proposal, meet with affected local unions to explain

the proposal, and participate in a hearing before a CHOPS committee, composed of an equal number of Company and Union representatives, to work out changes to the seniority rights of employees affected by the CHOPS. Under the NMFA, Yellow has the exclusive right to run its business, effect mergers, consolidate operations, open and close terminals, and the Union cannot interfere with those entrepreneurial decisions—its involvement is limited to determining and resolving the seniority of those Union employees affected by the change.

13.     Phase 1, implemented in September 2022 in the western region representing approximately 20% of Yellow's network, integrated the operational systems at 89 terminals, consolidated 20 terminals into others, established 11 new "velocity distribution center" terminals, and created 260 new "Utility Employee" positions—drivers who are also contractually permitted to handle freight on the dock to reduce the inefficiencies caused by the separation in functions. Yellow and the Union followed the contractually mandated procedures for Yellow's Phase 1 CHOPS; it and the Union resolved, pursuant to the NMFA, the seniority issues; and the Phase 1 CHOPS was approved.

14.     Before Phase 1 was completed, Yellow already was planning for Phase 2, the largest of the phases. Phase 2 addresses operations in the Northeast, Midwest, and Southeast, representing approximately 70% of Yellow's network.

15.     Yellow followed the CHOPS procedures in the NMFA for Phase 2, as it had for Phase 1. Yellow modeled its Phase 2 CHOPS documents on those that the Union approved during Phase 1, submitted them to the Union in October 2022, and met with affected local unions to discuss the changes.

16.     In or about January 2023, the Union, at Mr. O'Brien's direction and in breach of the NMFA, derailed the implementation of Phase 2. Instead of following the contractually

bargained-for and ordinarily routine CHOPS procedures, Union leadership decided, given Yellow's critical need to implement Phase 2, to use the CHOPS process as leverage to extract wage increases for the Union's members. The Union had no right to require wage increases from Yellow as a condition of approving CHOPS, or to have unilaterally canceled the CHOPS hearing, and both actions breached the NMFA. The Union also unjustifiably seized on such new positions in Phase 2 as a means to impede One Yellow.[2]

17.     Eight months since Yellow first proposed the Phase 2 CHOPS, the Union still has not agreed even to schedule the NMFA-required hearing, much less approve implementation of the Phase 2 CHOPS.

18.     The Union's first breach was to reject Yellow's initial Phase 2 CHOPS, which were modeled after Phase 1, on the grounds that Phase 2 created too many Utility Employee positions, which, it claimed, IBT members would not want to fill. Rather than work through that issue pursuant to the NMFA, the Union insisted that Yellow expand the "designated terminals" agreement that Holland uses, which permits Holland drivers to load and unload freight and swap out trailers themselves at certain "designated terminals."

19.     To avoid further delay, and as a compromise, Yellow agreed to adopt the Union's suggestion to rewrite the CHOPS based on a designated terminals model, rather than on a Utility Employee model.

20.     After reminding senior Union leadership that One Yellow is critical to Yellow's survival and that time was of the essence, Yellow submitted revised CHOPS documents in

---

[2] *Land Line*, an authoritative trucking industry media source, reported: "The union is making an issue of a Yellow requirement that some reassigned drivers sometimes handle freight on the dock – an ancient work rules issue that should have died long ago. LTL pickup and delivery drivers are freight handlers by definition. Of course they should handle freight if they're on the dock."

accordance with the Union's stated preference, met with the affected local unions, and requested a CHOPS hearing.

21.     Although the Union set a hearing date, it quickly reversed itself, issuing a press release falsely stating that the revised CHOPS, which had adopted the Union's proposal for facilitating the changes, failed to address purportedly serious concerns the Union had raised. Based on that false pretext, and in breach of Article 8, Section 6 of the NMFA, the Union refused to move forward with the contractually mandated process—and unilaterally canceled the CHOPS hearing, instead insisting that the Phase 2 CHOPS be put to a member vote.

22.     Again in the interest of quickly implementing One Yellow, Yellow acceded to the Union's extra-contractual demand for a member vote, knowing that Yellow's IBT member-employees overwhelmingly supported One Yellow.

23.     After Yellow agreed to the member vote, Union leadership again reversed itself, refused to send the matter to a vote, and then insisted that if Yellow wanted to move forward with Phase 2, it must reopen the NMFA, modify the CHOPS, or negotiate a memorandum of agreement that included the contract language necessary to implement the Phase 2 CHOPS.

24.     Derailed from the CHOPS procedure, and denied a member vote, Yellow prepared a letter agreement making the demanded contract changes to the Union's favored designated terminals model. Although senior Union leadership was aware that the Union's delay in implementing One Yellow had already caused significant harm to Yellow and would soon cause catastrophic harm, it nonetheless rejected the proposed letter agreement, reaffirmed that a Phase 2 CHOPS hearing would not go forward, and stated that if Yellow wanted to move forward with Phase 2, it needed to formally reopen the collective bargaining agreement and include "significant economic improvements" for the Union's members.

25.     Faced with the need immediately to implement One Yellow, Yellow again agreed to compromise by fully reopening the NMFA, but only if negotiations occurred immediately, given that the Union-caused delay in implementing Phase 2 had damaged Yellow's financial condition to the point where its ability to continue as a going concern was in serious question.

26.     Once again, however, at Mr. O'Brien's direction, the Union reversed itself and refused to negotiate. Instead, it conditioned its agreement to come to the bargaining table on Yellow agreeing in advance to give upfront wage increases.

27.     In refusing, once again, even to negotiate over CHOPS issues for Phase 2 of One Yellow, let alone comply with the Union's contractual obligations, Sean O'Brien tweeted: "The proposed changes to our contract from @Yellow_Trucking are despicable." What Mr. O'Brien was describing as "despicable"—and virtually the only reason for his refusal to agree to Phase 2 of One Yellow—was that One Yellow calls for a small fraction of Yellow's freight drivers to also assist in handling freight on loading docks in some terminals, very common practice in the industry. Indeed, for more than 15 years, 400 of Yellow's freight drivers routinely handled freight on the dock at terminals where that was required. Mr. O'Brien apparently preferred that 30,000 people lose their jobs, including 22,000 of his Teamsters, than to have a small fraction of Yellow's drivers (fewer than 600 out of thousands) exit their trucks and spend a bit of time on the loading dock at certain Yellow terminals.

28.     Mr. O'Brien's hostile approach to Yellow is what he promised when he campaigned in 2021 for the position of IBT General President: "You chose a team dedicated to rebuilding the Teamsters as a militant, fighting union from bottom to top. …. Employers and politicians are on notice — the Teamsters union is back." "Fighting for workers is a full contact sport," Mr. O'Brien reportedly said, "We call on every Teamster to put your helmet on and buckle your chinstraps

because the fight begins today." For Mr. O'Brien, buckling his chinstrap includes demonizing the senior leaders of companies that are in his gunsights. As reported in *The Washington Post*, Mr. O'Brien claims that Jeff Bezos, Elon Musk, and Howard Schultz, of Amazon, Tesla, and Starbucks, respectively, "are white-collar criminals," that senior management of TForce, a competitor of Yellow, is a "white-collar crime syndicate," and Yellow's CEO is incompetent and a clown.

29.     Despite his obligations as President of the Union to its members, Mr. O'Brien plainly does not care about the 22,000 Yellow IBT employees whose jobs now hang in the balance as a result of the Union's contractual breaches, nor does he care about the damage he will cause to America's supply chains and the economy, or the higher consumer prices that will result from loss of competition in LTL freight shipping. He and the Union are focused instead on the bigger prizes of negotiating with UPS and unionizing Amazon. Indeed, Mr. O'Brien has said, "Yellow has shown that it doesn't deserve and cannot be expected to continue under its current structure," and that he does not care about Yellow or its survival.

30.     Notwithstanding Mr. O'Brien's and the Union's unwarranted hostility and contractual breaches, Yellow has continuously tried to reach an amicable resolution. While the Union has refused to move forward with Yellow's proposals under the contractual procedures and instead has made serial extra-contractual demands on Yellow, Yellow has tried to accommodate the Union's demands each time, with the hope and expectation that such accommodations would result in implementation of the long overdue and critically important Phase 2. But each time Yellow agreed to a Union demand, the Union changed its demand, exposing its real agenda of leveraging Yellow's acute need for Phase 2 to extract a wage increase that Yellow cannot afford and that under the NMFA the Union has no right to require.

31.     During the months-long back-and-forth between Yellow and the Union, Yellow has pursued every angle to try to reach an agreement with the Union. Recently, Yellow contacted the Biden Administration to apprise it of the imminent loss of tens of thousands of jobs, the significant anti-competitive effects on the American economy, and the devastating impact on the country's supply chains Yellow's demise will cause, and to seek White House assistance in persuading the Union to negotiate a mutually acceptable CHOPS—all to no avail.

32.     Mr. O'Brien has remained steadfast in pursuit of his grandiose goal of having the Teamsters organize America's work force so labor can further socialize America's private enterprise, ambivalent about Yellow and its 30,000 employees, undeterred by being in breach of the NMFA, and deaf to White House outreach. Indeed, while the Biden Administration self-proclaims to be the most pro-union Administration in American history, and while the White House did reach out to encourage the Union to work out its issues with Yellow, even it is unable to talk reason to Sean O'Brien, who simply does not care about the jobs that will be lost, the damage to America's already fragile supply chains that will ensue, or the detrimental impacts to the economy he will trigger. Sean O'Brien's White House rebuff is all the more insulting to the Biden Administration inasmuch as the United States Treasury is both Yellow's largest creditor and its largest shareholder, holding 30.1% of Yellow's outstanding stock.

33.     After hitting a dead end with the White House, Yellow also reached out to the office of Senator Bernie Sanders, since the Vermont senator is widely considered to be one of the politicians in America whose views matter most to Sean O'Brien. Senator Sanders' office, however, chose partisan politics over saving good paying union jobs and the American economy, jobs for 30,000 employees who come from all walks of life and work in all 50 states, jobs at a Company whose groundbreaking diversity efforts have been noted. Senator Sanders' office said

that Yellow is not the sort of company Senator Sanders wants to help because it obtained relief under the CARES Act in the previous administration.

34.     By stonewalling Yellow's implementation of Phase 2, the Union has knowingly and intentionally triggered a death spiral for Yellow. The harm it has caused and continues to cause Yellow was foreseeable and serious, and the Union has failed and continues to fail to take any reasonable precautions to protect Yellow's economic interests. Indeed, far from taking any reasonable precautions, such as by following the contractually subscribed CHOPS process, or acting with the urgency this situation demands, the Union has acted and is acting in a manner deliberately intended to injure Yellow.

35.     Every month the Union breaches its contractual obligations, Yellow has lost the savings and increased revenues that One Yellow's implementation would provide—amounting, so far, to more than $137.3 million (and counting) in lost adjusted EBITDA. Each day the Union blocks the successful completion of One Yellow, Yellow gets closer to running out of cash, and its ability to refinance the $1.3 billion in debt that comes due in 2024 becomes more impaired. Concern about Yellow's ability to refinance led S&P to downgrade Yellow's issuer credit rating in February 2023, led Moody's to downgrade Yellow's ratings in May 2023, and has caused S&P to caution that it could further lower Yellow's ratings.

36.     Pushed to the brink by the Union's breaches of the NMFA, and its false promises, and with the Union refusing to participate in the contractually mandated CHOPS process, Yellow must now take immediate steps to try to save itself. This situation might have been avoided if the Union had simply gone ahead with the CHOPS hearing last April, or otherwise agreed to sit down with Yellow and negotiate in good faith. Yellow, however, will not go down without a fight, trying to preserve its value as a going concern and to save the jobs of every one of its 30,000 employees.

37.     Accordingly, Yellow brings this action to enforce its contractual rights and to recover (i) over $137.3 million (and counting) in damages the Union has caused Yellow, and continues to cause Yellow, through its ongoing breaches of the NMFA, and (ii) at least $1.5 billion for the loss in enterprise value that Yellow is sustaining and will sustain as a result of the Union's breaches.

## I.     JURISDICTION AND VENUE

38.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185(a), also referred to as Section 301 of the Labor Management Relations Act, which grants federal courts subject-matter jurisdiction over an action to enforce the terms of collective bargaining agreements.

39.     This Court has personal jurisdiction over the IBT, TNFINC, and the Local Unions under 29 U.S.C. § 185(c), which grants federal district courts jurisdiction over a labor organization in "any district in which its duly authorized officers or agents are engaged in representing or acting for employee members," because duly authorized officers and/or agents of the IBT, TNFINC, and the Local Unions are engaged in representing or acting for members employed by Yellow in this district. The IBT has more than 10,000 members in Kansas, including approximately 168 of Yellow's IBT employees. A number of these Kansas-domiciled Yellow employees are affiliated with Local 795 in Wichita, Kansas and Local 696 in Topeka, Kansas. In addition, Yellow employs approximately 500 other IBT members at its terminal in Kansas City, Missouri, many of whom are affiliated with Local 41 in Kansas City, Missouri, and many of whom reside in Kansas. In addition, the IBT has established Joint Council 56 out of Kansas City, Missouri, which involves itself in Kansas matters and represents more than 10,000 Teamsters in Kansas. Regarding the

events at issue in this lawsuit, officers and agents of the IBT have been representing Yellow's 168 Kansas-based Teamsters, as well as the Local Unions, each of which is also party to the NMFA.

40.     Venue is proper in this Court pursuant to: (i) 29 U.S.C. § 185(a), which provides that suits for violation of contracts between an employer and a union "may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regarding to the citizenship of the parties," because this Court has jurisdiction over the parties; and (ii) 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to plaintiffs' claims occurred in this district, where until 2022, Yellow maintained its headquarters, and where Yellow currently employs more than 1,200 employees and maintains a field resource center that provides centrally managed support to its operating companies, including the other plaintiffs, that spans a variety of functions, including legal, transportation management, human resources, finance, accounting, sales and marketing, information technology, revenue management, risk management, procurement, and security. Each of these Kansas-based functions, in turn, either administers services for, supports, or otherwise enables Yellow's IBT employees.

## II.    PARTIES

41.     Plaintiff Yellow Corporation is a Delaware corporation with its principal place of business in Nashville, Tennessee. Yellow Corporation, through its operating subsidiaries—including plaintiffs YRC Freight, Holland, New Penn, and Reddaway—offers customers a wide range of transportation services and has one of the largest, most comprehensive LTL networks in North America. Yellow collectively employs approximately 30,000 people, including approximately 22,000 IBT members, who chiefly comprise the Company's drivers and dock, maintenance, and clerical workers. As set forth above, Yellow maintains a significant operational presence in Overland Park, Kansas.

42.     Plaintiff YRC Inc. (d/b/a YRC Freight) is a Delaware corporation with its administrative functions supported in Overland Park, Kansas. YRC Freight is Yellow's legacy operation and largest LTL subsidiary, and is a leading transporter of industrial, commercial, and retail goods across North America.

43.     Plaintiff USF Holland LLC is a Delaware limited liability company that retains an office in Holland, Michigan, and has numerous functions run out of Overland Park, Kansas. Holland historically operated in the central portion of the country from its Michigan headquarters and now provides next-day LTL services across the Central, Southeastern, and Midwestern regions of the United States.

44.     Plaintiff New Penn Motor Express LLC is a Delaware limited liability company with its administrative functions supported in Overland Park, Kansas. New Penn provides next-day LTL services across the Northeastern region of the country, as well as cross-border service to Eastern Canada.

45.     Plaintiff USF Reddaway Inc. is an Oregon corporation with its administrative functions supported in Overland Park, Kansas. Reddaway provides next-day and two-day LTL services across the Western region of the country, including in Hawaii, as well as cross-border service to Western Canada and intermodal transportation by sea to Alaska.

46.     Defendant International Brotherhood of Teamsters is a labor organization and one of the nation's largest labor unions. The IBT serves as the governing body for the local unions that represent a majority of plaintiffs' employees, including approximately 22,000 drivers and dock, maintenance, and clerical employees. The IBT has more than 10,000 members in Kansas, including approximately 168 of Yellow's IBT employees. The IBT acts as the national representative for affiliate local unions throughout the country, including local unions in Kansas

and in Missouri whose members Yellow employs in Kansas, and it has been representing the Kansas Teamsters in the One Yellow Phase 2 CHOPS process, including by taking affirmative steps on their behalf to, and instigating, supporting, ratifying, and encouraging the Local Unions to, block implementation of Phase 2 of One Yellow. The IBT's leadership, including Sean O'Brien and General Secretary-Treasurer Fred Zuckerman, comes to Kansas to meet with Kansas-domiciled IBT members.

47.     Defendant Teamsters National Freight Industry Negotiating Committee is the bargaining committee formed by the IBT to represent local unions in the Freight Division. TNFINC represents local unions affiliated with the IBT in their negotiations with Yellow over the collective bargaining agreements at issue in this action. As General President of the IBT, Mr. O'Brien is the Chairman of TNFINC, and he appoints the members of TNFINC. As Freight Division Director, John Murphy is Co-Chair. Mr. Murphy, the two Assistant Freight Directors, and the Freight Division Coordinators are all appointed and serve at the pleasure of General President O'Brien. The remainder of TNFINC is comprised of local union representatives.

48.     The IBT's local unions are labor organizations affiliated with the IBT.

49.     Defendant Teamsters Local 696 is an IBT local union located in Topeka, Kansas that represents approximately 938 IBT workers throughout the northern half of Kansas. A number of Kansas-domiciled Yellow employees are affiliated with Local 696.

50.     Defendant Teamsters Local 795 is an IBT local union located in Wichita, Kansas that represents approximately 1,566 IBT workers. A number of Kansas-domiciled Yellow employees are affiliated with Local 795.

51.     Defendant Teamsters Local 41 is an IBT local union located in Kansas City, Missouri that represents approximately 6,111 IBT workers. Yellow employs approximately 500

other IBT members at its terminal in Kansas City, Missouri, many of whom are affiliated with Local 41, and many of whom reside in Kansas.

## III.   FACTUAL ALLEGATIONS

### A.   Who Yellow Is and What Yellow Does

52.    Yellow offers customers a full range of services for the transportation of industrial, commercial, and retail goods in national, regional, and international markets. Yellow provides transportation services for various categories of goods, including goods for key industries currently facing product shortages, such as pharmaceutical and health care, baby formula, defense sector parts and supplies, food and beverage, construction manufacturing components, aerospace, automotive, and industrial industries.

53.    Yellow's deliveries are predominantly LTL or less-than-truckload shipments (*i.e.*, goods from multiple shippers are transported in a single trailer). Yellow also provides higher-margin specialized services, including guaranteed expedited services, time-specific deliveries, cross-border services, exhibit services, product returns, and government material shipments.

54.    As of December 31, 2022, the Company's network includes 308 strategically located service facilities, including 166 owned facilities with approximately 10,000 doors and 142 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by its logistics solution provider, Yellow Logistics.

55.    As of December 31, 2022, the Company's revenue fleet was comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and 1,000 leased tractors, and approximately 42,000 trailers, including approximately 34,800 owned trailers and 7,200 leased trailers.

56.    As of December 31, 2022, Yellow employed nearly 30,000 people. The Company's employees are dedicated to operating its extensive network, which transported approximately 14.2

million shipments in 2022, for approximately 250,000 customers, including the U.S. Government, generating more than $5.2 billion in operating revenue, and, considering the relevant economic impact multiplier, generating an impact of $34 billion in the overall economy. Yellow operates terminals in 300 communities, with employees in all fifty states.

57.     Each of Yellow's LTL operating subsidiaries has employees who are members of the IBT. Yellow's IBT employees, approximately 22,000 as of December 31, 2022, represent approximately 82% of Yellow's workforce.

58.     Yellow is the largest unionized LTL carrier in the United States. Approximately 80% of Yellow's LTL competitors do not employ drivers or other workers who are members of a labor union.

### B.     Yellow Acquires Other LTL Carriers

59.     Yellow's legacy operation, Yellow Freight, was founded in Oklahoma City in 1924 and operated as a regional freight carrier in the Midwest for many decades. After passage of the Motor Carrier Act of 1980 eliminated regulations and rate restrictions that had historically limited carriers' ability to operate, Yellow significantly expanded Yellow Freight's operations, and by the early 1990s Yellow Freight operated more than 700 terminals.

60.     Yellow expanded again in the early 2000s, this time through a series of acquisitions and consolidations of other LTL carriers, beginning with the acquisition of Roadway Express, and Roadway's Northeast regional subsidiary, New Penn, in 2003. Yellow Freight was merged with Roadway to create a new combined operating company that provided nationwide freight services, known as YRC Freight, while New Penn continued to operate within its original footprint in the Northeast.

61.     In 2005, Yellow acquired USF Corp. and several of its regional subsidiaries, including Holland, USF's regional operation in the Midwest and South, and Reddaway, USF's regional operation in the West.

**C.     Yellow's New Leadership Conceives and Commits to the "One Yellow" Enterprise Transformation**

62.     Beginning in 2018, Yellow transitioned to a new senior leadership team.

63.     Darren Hawkins became Chief Executive Officer in April 2018, and since then has led the Yellow team in making its most significant investments ever to build on its 100 years of service to North American supply chain customers.

64.     Darrel Harris became President and Chief Operating Officer in November 2021. Mr. Harris had joined Yellow in November 2020 as Executive Vice President of Strategic Initiatives with the responsibility for instituting and leading a company-wide enterprise transformation initiative that not only modernizes the way freight is delivered but also expands and enhances services available to Yellow's customers. Mr. Harris is the first Black person to serve in the highest leadership position (president or CEO) at a major U.S. trucking company.

**1.     Yellow Makes the Business Decision to Commit to One Yellow**

65.     The new leadership team recognized inefficiencies and redundancies resulting from the growth of Yellow's network through acquisitions. As an example, with its subsidiaries still operating separately, trucks from multiple subsidiaries would visit the same customer on the same day, multiplying the Company's costs of servicing the customer, such as fuel and driver wages. Mr. Hawkins explained: "[T]he drivers from both of our companies pass each other going to cover these pickup and delivery areas. They're in two trucks, two drivers, two trailers, and unfortunately they're going to the same customer."

66.     Not only was this state of affairs inefficient and costly from the Company's perspective, but customers had expressed the desire to work with one driver and one truck when picking up for regional and long-haul services.

67.     To address inefficiencies and improve customer service, in 2019, Yellow announced the "One Yellow" enterprise transformation, designed to transform Yellow from a disparate set of operating companies and brands into a unified national platform that operates as one company, one network, under one Yellow brand. From the customer's perspective, One Yellow would mean one call, one truck, one driver, one dock door.

68.     In transportation industry jargon, One Yellow will combine the vast national network of the YRC Freight brand with the speed and consistency of Yellow's regional brands to create one "super-regional carrier."

69.     The combination of Yellow's four individual linehaul networks—its legacy national (YRC Freight) and its regional (Holland, New Penn, and Reddaway) carrier brands—will result in greater density as freight moves throughout Yellow's network from origin to destination terminals. Local terminal pickup and delivery optimization efforts will eliminate the overlapping coverage and customer interactions between Yellow's legacy national and regional carrier brands.

70.     The One Yellow transformation will grow Yellow's Velocity Center network, which will add speed and reduce its cost structure; create a faster "network cycle," which will lower the overall cost structure by reducing or eliminating various expenses; and provide more premium and expedited service opportunities.

71.     When Yellow becomes a super-regional carrier and improves its on-time rate, it can better compete for the most lucrative, higher margin next-day delivery work, which typically

requires an on-time rate of at least 95%, an on-time delivery rate that is consistently above Yellow's rate due to its current network inefficiencies.

72.     In addition to creating a unified carrier with integrated services across the country, offering its customers improved service, faster delivery, more next-day lanes, and regional service in locations Yellow never had before, the One Yellow strategy includes fleet investment for tractors, trailers, and containers, and labor investment.

73.     The One Yellow transformation will decrease costs by increasing "home time" for drivers (reducing need for overnight accommodations), improving equipment efficiency with shorter turn times and dual utilization of equipment, and shrinking transit times with greater reach within regional markets. Yellow anticipates that the One Yellow transformation will lead to a 3% reduction in miles, along with other savings in facility, equipment, and other reductions.

74.     Once implemented, the Company anticipates that One Yellow will create a financial opportunity to capture upwards of $675 million in annual revenue or 13.5% in incremental EBITDA.

75.     Since 2019, Yellow has completed five steps to prepare for the implementation of One Yellow: it ratified a new five-year labor contract with the Union; refinanced its term loan with improved and more flexible terms; reorganized its leadership team to streamline decision making and enhance execution across all functional areas of the organization; completed the reorganization of the enterprise-wide sales force; and completed the One Operating Platform initiative to migrate its operating subsidiaries to a common IT platform.

76.     The "One Yellow" implementation is designed to be completed in three phases:

   a. Phase 1 (20% of network): Completed in September 2022, Yellow consolidated YRC Freight's operations with Reddaway's operations in the West.

    b.   Phase 2 (70% of network): Yellow will consolidate YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast.

    c.   Phase 3 (10% of network): Yellow will consolidate YRC Freight's operations with Holland's remaining operations in the Central and Southern regions.

    **2.   Immediate Implementation of One Yellow Is Crucial to Yellow's Ability to Continue as a Going Concern**

77.    Beginning in 2019, the Company worked to put a capital structure in place to provide sufficient liquidity to invest in its planned initiatives.

78.    In September 2019, Yellow refinanced its term loan obligations under a 2014 credit agreement and entered into a term loan agreement with funds managed by affiliates of Apollo Global Management, LLC acting collectively as the Lead Lender for a $600 million facility (the "Term Loan"). Yellow's debt is largely unconditionally guaranteed by each of Yellow's subsidiaries' real estate and hard assets. The Term Loan has a maturity date of June 30, 2024, with a single payment of the outstanding balance of $567.4 million due at maturity.

79.    In July 2020, Yellow entered into two credit agreements pursuant to which the U.S. Treasury provided a $700 million loan to the Company under the CARES Act (the "US Treasury Loan"). Yellow entered into the US Treasury Loan because YRCW[3] and its operating companies Holland, New Penn, Reddaway, and YRC Freight were significantly impacted by the COVID-19 pandemic. As a result of the US Treasury Loan, the U.S. Government has become the largest single shareholder of Yellow. If not refinanced, Yellow will be required to make a lump-sum payment of $729.4 million on September 30, 2024, the maturity date of the credit agreements.

---

[3] On February 4, 2021, YRC Worldwide Inc. ("YRCW") changed its name to Yellow Corporation.

80.     In addition to the Term Loan and the US Treasury Loan, in October 2022 Yellow entered into an amended 2014 asset-based lending facility to increase capacity by $50 million to up to $500 million. Yellow has drawn down $24.2 million. The facility has a springing maturity commencing 30 days prior to the maturity of any of the Term Loan or US Treasury Loan.

81.     Yellow has other debt-servicing and contractual cash obligations. Yellow will spend more than $45 million on lease-financing obligations in 2023, and more than $84 million in the next three years; and $67 million on operating leases in 2023, and more than $57 million in the next three years.

82.     In 2021, the Yellow Board of Directors projected that servicing debt principal would soon severely affect net cash flow, and that significant gains in annual EBITDA were required to keep up with the Company's expenditures. Indeed, the Board determined that an annual EBITDA of $450 million was necessary to meet the combined demands of the Company's capital expenditures and interest payments.

83.     Prompt and successful implementation of One Yellow is absolutely vital to Yellow's ongoing ability to generate sufficient cash flows from its operations to continue servicing its debt and avoid a default, in addition to funding its multi-billion-dollar IBT payroll, health, welfare, and pension obligations.

84.     Moreover, Yellow must refinance the approximately $1.3 billion of loan obligations that mature during 2024, and refinancing depends on Yellow demonstrating to the capital markets improved operations from the successful implementation of One Yellow. Yellow's credit ratings also depend on its ability to refinance its loan obligations.

### 3. Under the NMFA, the Union's Involvement in Implementation of One Yellow Is Limited to Issues Relating to Its Members' Seniority

85.     Yellow's YRC Freight, New Penn, Holland, and Reddaway[4] subsidiaries employ most of their unionized employees under the terms of the NMFA.

86.     TNFINC negotiates the NMFA on behalf of the local unions and their IBT members, and Yellow negotiates on behalf of its subsidiaries YRC Freight, Holland, New Penn, and Reddaway, as employers.

87.     When Yellow decides on operational changes, the Union's only role and its obligation is, under contractually prescribed procedures, to work out with Yellow the seniority of those Union members affected by the change. Under the NMFA, the Union has no contractual (or other legal) right to encumber Yellow's entrepreneurial control of, and decision-making authority over, its business, such as the decisions to acquire Holland, New Penn, and Reddaway, or the decisions about how to merge those operations with those of YRC Freight to create a super-regional carrier.

88.     IBT's Freight Director John Murphy admitted as much in an April 19, 2023 "Yellow Update Call" held for Yellow's IBT members: "[I]n the last contract, which was 2019, Yellow negotiated and received numerous flexibilities, such as: . . . the ability to merge and close terminals of different operating companies to eliminate duplicity coverage through the change of operation process."

89.     Article 5, Section 2 of the NMFA addresses corporate mergers and provides that the effect of those business decisions on seniority of Union members must be determined through

_____

[4] Reddaway was not a signatory to the NMFA in 2019, at the time operating under a separate Reddaway-only agreement, but it agreed to become signatory to the NMFA in June 2021, retroactive to April 1, 2021.

an appropriate CHOPS process. "In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved."

90.     That CHOPS Committee process is set forth in Article 8, Section 6, which limits the Committee's authority to seniority issues:

> Present terminals . . . shall not be transferred, changed or modified without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Regional Areas, equally composed of Employer and Union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

91.     The NMFA also makes clear that the CHOPS Committee is not empowered by the NMFA to reject operational changes or otherwise impede them. Article 8, Section 6, provides that Yellow has the right to manage and operate the Company as it sees fit, including specifically that the CHOPS Committee "shall observe the Employer's right to designate domiciles and the operational requirements of the business."

92.     Article 8, Section 6(b) further provides:

> The Employer shall notify all affected Local Unions of the proposed change of operations at least thirty (30) calendar days prior to the hearing at the Regional Joint Area Committee, and the Employer and the Local Unions involved shall have a mutual responsibility to inform the employees subject to redomicile prior to such hearing in accordance with the practice and procedures agreed to in the respective Area Committee.

93.     In Article 3, Section 7, the NMFA provides Yellow flexibility to establish Utility Employee positions, a new position when the NMFA was executed in 2019:

> The parties recognize the need for the Employers to compete effectively in a changing environment. To this end, there shall be established a new position on the local cartage seniority list called a Utility Employee. The intent of the parties' creation of the Utility Employee position is to generate additional job opportunities and enhance employee earnings, by enhancing the Employer's ability to compete and grow.

. . . .

The parties recognize that most, if not all locations will have Utility Employees. . . . Subject to the approval of the National Utility Employee Review Committee or the Committee Chairman . . . the Employer may establish and modify Utility Employee positions and bids without the approval of a change of operations or other Union approval.

94.     The National Utility Employee Review Committee ("NUERC"), a joint panel of Union and Company representatives, has authority to determine the seniority application of employees affected by an operational change, and the NUERC's decision is final and binding. If the NUERC cannot resolve the matter, the case is submitted to the National Review Committee on an expedited basis.

95.     Article 3, Section 7 also provides for binding grievance procedures for disputes concerning proposed use of Utility Employees, whereby a grievance is first referred to the NUERC for resolution, and if the NUERC cannot reach a decision, to the National Grievance Committee.

In the event the National Utility Employee Review Committee is unable to resolve a matter, the case shall be submitted to the National Review Committee on an expedited basis. Neither the Union nor the Employer shall unreasonably delay the scheduling or completion of any requested meeting, or the submission of any dispute to the National Review Committee. In no event shall a Utility Employee operational change hearing be held more than fifteen (15) business days after the Employer meets with the affected Local Unions to discuss the written operational change proposal.

96.     The NMFA contains an express no-strike provision in Article 8, Section 3(a):

[A]ll grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, except as authorized by law, as provided below or as specifically provided in other Articles of the National Master Freight Agreement, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement.

No other provision of the NMFA permits work stoppages, slowdowns, or walkouts—*i.e.*, strikes —in connection with disputes or grievances concerning Article 5, Section 2 mergers; Article 8, Section 6 changes of operations; or Article 3, Section 7 Utility Employee changes of operations.

**D.      Yellow Implements Phase 1 of One Yellow**

97.     After Yellow decided to proceed with Phase 1, in accordance with the NMFA it submitted two CHOPS to the Union on May 2, 2022: a "2022 Terminal Consolidation, Terminal Zip Code Realignment, Velocity Distribution Center & Road Network Realignment Change of Operations (Article 8, Section 6)"; and a "2022 Utility Employee Change of Operations (Article 3, Section 7)."

98.     The CHOPS contemplated Yellow integrating the operational systems at 89 terminals, reducing the total number of terminals in the combined YRC Freight-Reddaway network to 9 terminals by consolidating 20 terminals into others and establishing 11 new "velocity distribution center" terminals,[5] and creating 260 new Utility Employee positions. Utility Employees would be guaranteed out-and-back routes, usually under 175 miles, that would allow them to return home each day at the end of their shifts.

99.     Yellow thereafter met with all of the affected local unions to gain support for its CHOPS and address any concerns.

100.    A CHOPS hearing was held on the proposed CHOPS on July 26, 2022. Mr. Murphy, as Director of the National Freight Division, was the Union's chair of the CHOPS Committee that issued a decision approving the CHOPS on August 5, 2022, holding that the seniority application was appropriate under the circumstances, and approving the Company's proposed method of bidding into Utility Employee positions.

101.    In an April 19, 2023 Yellow Update Call to IBT members, Mr. Murphy recently reiterated that the Phase 1 CHOPS were appropriate under the NMFA: "As you know, last summer

---

[5] At Yellow's velocity terminals, freight is assembled from end-of-line terminals and "broken," or parceled out, to drivers for local delivery.

Yellow did a major change of operations in the Western region of the country. That change involved creating UE positions and having UE employees drive and work the dock under the contract. The Western change did not violate the contract."

102.    In September 2022, Yellow successfully implemented Phase 1 of One Yellow, consolidating YRC Freight's operations with Reddaway's operations in the West. Thus far, the results are meeting Yellow's expectations.

103.    One Yellow, if fully implemented, will continue to dramatically improve EBITDA, reaching $450 million within a year. As operational efficiencies continue to improve over time, EBITDA is expected to grow even further.

**E.    Yellow Plans for Phase 2 of One Yellow**

104.    Before completing the implementation of One Yellow Phase 1, which covered approximately 20% of the Company's network, Yellow began planning for the much larger Phase 2, which covers 70% of the Company's network.

105.    Phase 2 of One Yellow consolidates YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast.

106.    Yellow intended to implement Phase 2 by the end of December 2022, and Phase 3 shortly thereafter.

**F.    Yellow Submits Initial Phase 2 CHOPS Based on Phase 1, but the Union Has Other Ideas**

107.    Yellow prepared CHOPS for Phase 2 that it modeled after the Phase 1 CHOPS, which the Union approved and which Mr. Murphy admitted were proper under the NMFA.

108.    On October 19, 2022, Yellow submitted the two CHOPS: a "2022 Terminal Zip Code Realignment, Velocity Center & Road Network Realignment Change of Operations (Article 8, Section 6)"; and a "2022 Utility Employee Change of Operations (Article 3, Section 7)."

109.    The Phase 2 CHOPS contemplated consolidation of YRC Freight's operations with Holland's and New Penn's in the East, Central, and portions of the Southern regions; establishment of one dispatch system across all three operating companies; creation of 35 new velocity distribution centers; elimination of 19 terminals in the YRC Freight-Holland-New Penn network; and creation of 998 Utility Employee positions.

110.    As with its Phase 1 CHOPS, Yellow, following the letter of the NMFA, proposed in its initial Phase 2 CHOPS to create Utility Employee positions to staff its velocity distribution centers with drivers who would travel a maximum of 175 miles and return home after each shift.

111.    Yellow met with Union leadership, including Mr. Murphy, as well as representatives of 106 local unions affected by the CHOPS, including Local 696, Local 795, and Local 41. Yellow engaged closely with the local unions and responded to hundreds of questions, including questions from Local 696, Local 795, and Local 41.

112.    In response, the Union insisted that, instead of attempting to staff the new velocity distribution centers with Utility Employees, as Yellow had during Phase 1 and as the NMFA allowed, Yellow expand a "designated terminal" agreement concerning Holland (the "Holland DTA"), which, since 2008, permits road drivers to load and unload freight and swap out trailers themselves at certain designated terminals.

G.    **Yellow Agrees to Revise Its Phase 2 CHOPS Based on the Union's Feedback, and the Union Refuses to Consider the Revisions**

113.    Based upon the Union's insistence that expansion of the Holland DTA, which had worked seamlessly for the preceding 15 years, was its preferred method for implementing the Phase 2 CHOPS, Yellow agreed to revise its initial Phase 2 CHOPS as an accommodation to the Union, because a designated terminals model still would allow Yellow to accomplish its business objectives.

114.    In a December 2, 2022 memorandum Mr. Murphy apprised Yellow Local Unions that Yellow was withdrawing its proposed CHOPS and would modify and refile. Mr. Murphy directed each local to carefully review the new CHOPS when refiled and reminded locals: "If you have questions or need assistance, please reach out to your Teamster Regional Freight Coordinator and/or the National Freight Division. We will do everything we can to assist in order to protect the members to the fullest extent possible as well as secure improvements for them wherever possible. . . . If you are unable to resolve your issues with the Company, please send a memo to the Freight Division detailing the issues in dispute."

115.    On December 12, 2022, Yellow officially withdrew its October 2022 CHOPS and informed Mr. Murphy it intended to submit a revised CHOPS that would, as the Union demanded, expand the Holland DTA to include 36 velocity distribution centers. The Union preferred expanding the Holland DTA because it would significantly reduce the number of new Utility Employees positions; minimize the need for road drivers to bid into Utility Employee positions; and merge seniority lists where there were multiple locations under the jurisdiction of the same local union, thereby providing more opportunities for drivers to "follow the work" to a new terminal, maintaining their existing routes and seniority and reducing the number of pool bids.

116.    When Yellow withdrew its October 2022 CHOPS, it advised Mr. Murphy in writing that the One Yellow transformation was "absolutely critical to the Company's ability to meet its immediate competitive challenges and secure long-term viability and success," and reiterated to the Union that time was of the essence in implementing Phase 2. Yellow pledged to meet with each affected local union to explain the revised CHOPS as soon as possible, and sought to expedite the process and set a hearing date in early 2023, with implementation to follow as quickly thereafter as possible, if approved.

117.    On December 15, 2022, the Union responded to Yellow and raised purported concerns about the proposed revisions. Yellow and the Union agreed to meet on December 27, 2022 to discuss.

118.    In an effort to provide as much information for the Union's consideration as quickly as possible, on December 20, 2022, Yellow's Senior Vice President of Trucker Relations Bryan Reifsnyder, who is Yellow's chief point of contact with the Union, emailed Mr. Murphy an updated summary of Yellow's proposed revisions, and informed him that Yellow had met with the 106 affected local unions, which included defendants Local 696, Local 795, and Local 41, and would be sending revised CHOPS later that week.

119.    Mr. Murphy responded that same day by scolding Mr. Reifsnyder for purportedly failing to address the Union's concerns set forth on December 15 and for revising the proposal when the parties already had a meeting planned to discuss the prior proposal.

120.    On December 27, 2022, Yellow met with the Union and explained that it intended to update its CHOPS to reflect the concerns and suggestions of the IBT and local unions.

121.    On January 4, 2023, Mr. Reifsnyder met with Mr. Murphy and the Freight Division Leadership in Chicago to continue the discussion. Mr. Murphy reiterated that the Union would not accept or consider the original Phase 2 CHOPS proposal, which mirrored the Phase 1 CHOPS proposal the Union had previously approved in September 2022, but instead wanted a revised proposal that would expand the Holland DTA. Mr. Murphy's rejection of the original Phase 2 CHOPS proposal was a breach of the NMFA, under which the Union may not dictate how Yellow runs its operations, may not refuse to consider a proposed CHOPS, and may not refuse to refer a CHOPS for a hearing.

122.    A February 1, 2023 news article published on the IBT website, "Teamsters Continue to Monitor Proposed Change of Operations at Yellow Corp. and Seek Protections for Members," reported: "The Teamsters Freight Division is continuing to monitor the situation as local unions meet with the company to address their concerns" about the proposed CHOPS Yellow filed. "'The Teamsters Freight Division fully supports our local unions as they demand information and answers from Yellow and seek protections for our members,' said Murphy."

**H.    Yellow Submits Revised Phase 2 CHOPS, and the Union Hijacks the Process to Try to Extort Wage Increases from Yellow**

123.    Despite the Union's general recalcitrance and its contract breaches, Yellow continued to try to reach an agreement on Phase 2.

**1.   Yellow Submits Revised Phase 2 CHOPS**

124.    On February 6, 2023, Yellow submitted two revised Phase 2 CHOPS: a "2023 Terminal Consolidation, Terminal Zip Code Realignment, Designated Terminal & Road Network Realignment Change of Operations (Article 8, Section 6)"; and a "2023 Utility Employee Change of Operations (Article 3, Section 7)." Yellow requested a hearing before the CHOPS Committee the week of March 10, 2023, and implementation no later than April 30, 2023, upon approval.

125.    With the revised Phase 2 CHOPS, Yellow proposed expanding the Holland DTA to include the 36 velocity distribution centers to be established during Phase 2 and reducing the number of Utility Employees positions from 998 to 121, as discussed with the Union in December and January, and per Mr. Murphy's express suggestion. The Phase 2 CHOPS would affect several Yellow locations in Kansas, including in Kansas City, Salina, Topeka, and Wichita.

126.    While the revised Phase 2 CHOPS contemplated consolidating some terminals, the overall effect would have been a net gain in total IBT employee headcount. In response to the

Union's concern that long-haul drivers might not want to change their job classifications to become Utility Employees, Yellow's revised proposal eliminated that requirement.

127.    Following the procedures outlined in the NMFA, Yellow mailed copies of the revised Phase 2 CHOPS to, and met with, the 106 affected local unions, including defendants Local 696, Local 795, and Local 41, to explain the proposed changes and answer any questions before the CHOPS hearing.

### 2.    The Union Sets a Hearing Months Out, Says It Will Not Endorse Any Operational Changes, and Makes a Veiled Threat to Strike

128.    Notwithstanding Yellow's repeated messaging to the Union that immediate implementation of One Yellow is crucial to the Company's continued viability, and the Union's knowledge of the Company's debt-servicing obligations, acute liquidity crisis, impending need to refinance more than $1.3 billion worth of loans, and notwithstanding that the NMFA gives the Union no right whatsoever to refuse to allow the CHOPS Committee to consider CHOPS, Mr. O'Brien decided that the Union would continue to block One Yellow in breach of the NMFA.

129.    Despite Yellow's February 6 request for a hearing date in early March, the Union pushed off the CHOPS Committee and NUERC hearing until April 5-7, 2023.

130.    In the interim, on February 14, 2023, the IBT issued a press release, "Teamsters Demand Answers to Proposed Operation Changes at Yellow," claiming that Yellow's revised Phase 2 CHOPS "fail[] to address serious concerns raised by the union" and that TNFINC "does not endorse or approve any operational changes at Yellow." Mr. Murphy was quoted in his capacity as "Teamsters National Freight Director" as saying, "The Teamsters oppose any change of operations written in vague language or drafted to erode contractual standards and practices. Yellow will not be allowed to disrupt and upend our members' lives." Despite the Union having been engaged in months of negotiations over the Phase 2 CHOPS, and despite Yellow having

amended its Phase 2 CHOPS at the Union's insistence to adopt the Union's preferred method for implementing the operational changes, it was now taking the position that no changes would be approved or endorsed, in breach of its obligations to follow CHOPS procedures in the NMFA. None of the Local Unions objected to the position Mr. Murphy took in breach of the NMFA or took any steps to ensure their own compliance with the NMFA.

131.    In the February 14, 2023 IBT press release, Mr. O'Brien, who was quoted in his capacity as "Teamsters General President," also threatened that "The Teamsters are done making concessions and we will not be pushed around . . . If Yellow management gets in the way of that, we will go after this company with everything we've got," which was understood to be a threat to strike in order to influence the CHOPS process, which would violate the NMFA's no-strike provision, and the IBT openly putting its power behind the local unions.

132.    The next day, February 15, 2023, the IBT's official Twitter account (@Teamsters) tweeted: "We are demanding answers to the proposed change of operations at @Yellow_Trucking after the company sent revised change-of-operations notifications to the union on Feb. 7."

133.    On February 24, 2023, Mr. O'Brien tweeted from his own account (@TeamsterSOB) about Yellow's proposed CHOPS: "Happening now: Walking the docks @Yellow_Trucking & talking with @teamster988 YRC members. Company tried pulling cute stunts recently with their proposed 'change of operations'…Not gonna happen at the expense of these working people #GuessAgain #FreightTeamsters #CoreIndustry."

134.    On February 27, 2023, S&P downgraded Yellow's issuer credit rating from B- to CCC+ and its issue-level rating on Yellow's Term Loan from B- to CCC+ because of uncertainty regarding Yellow's ability to refinance the Term Loan and US Treasury Loan. But S&P also noted its expectation that Yellow's financial performance would continue to improve as it implements

One Yellow: "The developing outlook reflects the uncertainty regarding Yellow's ability to refinance its debt maturities before they become current later this year. However, the company continues to improve its performance through the implementation of a new operating strategy, which we expect it will complete in the first half of the year, that could support its refinancing efforts."

135. In a video update from on or about March 2, 2023, Mr. Murphy, in his capacity as Teamsters National Freight Director, told IBT members:

> Over the past year, the Freight Division has been touring docks around the country . . . . We have talked to the members at YRC. The concern is wages, health and welfare, pension, working conditions. We have listened to the members. We understand where they want to be. And we continue to try and fight for better contracts, better working conditions for all of our members.

### 3. The Union Unilaterally Cancels the CHOPS Hearing and Insists on a Member Vote

136. On March 23, 2023, Company representatives met with the IBT senior leadership, including Mr. Zuckerman, in Washington, DC to discuss the revised Phase 2 CHOPS. Yellow's representatives arrived prepared to work through the Union's remaining concerns so they would be fully resolved prior to the scheduled April 5-7 hearing.

137. But the Union quickly made clear it had no intention of permitting the CHOPS Committee to consider the revised Phase 2 CHOPS. Instead, the Union used the March 23 meeting as a photo-op to demonstrate to its members it was taking a tough line with Yellow. The Union unilaterally canceled the April 5-7 hearing, rejected Yellow's revised Phase 2 CHOPS, and insisted that IBT members vote on the revised Phase 2 CHOPS, all in breach of the NMFA.

138. After the March 23 staged photo-op, Mr. O'Brien sent a tweet out of his Twitter account stating that: "The proposed changes to our contract from @Yellow_Trucking are despicable. #FredZuck & I have been all over the country meeting with our #FreightTeamsters.

It's clear they don't agree with this proposal. We will protect our members. This BS isn't going to fly. The games are over."

139.    In other words, Mr. O'Brien called "despicable" the very same Yellow Phase 2 CHOPS proposal that Mr. Murphy, the IBT National Freight Director and Co-Chair of TNFINC, had insisted Yellow adopt months earlier.

140.    Later the same day, Mr. Murphy sent a letter to Mr. Reifsnyder "to confirm that the Change of Operations hearing that had been scheduled to commence on April 5, 2023 in Irving, Texas is cancelled." None of the Local Unions objected to the IBT canceling the hearing or took any steps to have the hearing rescheduled, even though it was a violation of the NMFA to unilaterally cancel the hearing.

141.    In that same letter, Mr. Murphy falsely stated that the "Company reluctantly agreed" to the cancelation. Indeed, the Union's unilateral cancellation of the CHOPS hearing was so abrupt and unexpected that Yellow incurred a $58,500 cancellation fee from the hotel in Irving, Texas where the hearing was scheduled to take place and where the hearing participants were scheduled to stay.

### 4. After Yellow Accedes to a Member Vote, the Union Refuses to Send the Matter to a Vote; and the Union Forbids Purchased Transportation

142.    Yellow disagreed that a member vote was required for the CHOPS Committee to approve the Phase 2 CHOPS and did not agree to cancel the April 5-7 hearing. However, in an effort to move along the One Yellow implementation, on March 23, 2023, Yellow yet again acceded to a Union demand—this time that Yellow's IBT member employees be allowed to vote on the revised Phase 2 CHOPS. Yellow expected that its IBT employees would vote in favor of the CHOPS because they overwhelmingly support the One Yellow transformation and understand its criticality to the Company's survival.

36

143.     After Yellow agreed to the member vote that the Union requested, the IBT issued a press release, "Teamsters Reject Proposed Operation Changes at Yellow," that falsely stated, "Yellow's proposal seeks to jam through operational changes without a vote of the Teamsters' freight membership," and quoted Mr. O'Brien as saying, "Yellow doesn't want to put this to a vote because they know the Teamsters Constitution and they know our members will unanimously reject their proposal."

144.     The press release also stated:

> At the direction of General President Sean M. O'Brien and General Secretary-Treasurer Fred Zuckerman, the Teamsters cancelled a Change of Operations Committee meeting with Yellow planned for April 5-7.

> "Fred Zuckerman and I have been all over this country meeting with our freight members, who repeatedly tell us the company's proposed changes to the contract are unacceptable. . . . , " O'Brien said. ". . . We're not playing games."

> . . . . The 1.2-million-member union is continuing to take a harder look at Yellow's finances and analyze its ability to maintain operations under the existing agreement.

> "Our members need to participate in every step of the process regarding their contract. The Teamsters will not allow Yellow to railroad workers on any issue," Zuckerman said. "If any changes are going to be made to our contract, they'll be made on our terms and no one else's."

> . . . . The Teamsters demand that established work standards and contractual protections be maintained, that primary lanes be preserved, and traditional road driver classifications and dock workers be protected.

145.     The official IBT Twitter account (@Teamsters) also tweeted, summarizing what the IBT press release had said.

146.     On March 24, 2023, the Union took additional steps to injure Yellow. Mr. Murphy gave Yellow 30 days' notice "that the use of purchased transportation is no longer permitted by

37

any of the Yellow operating companies covered by the Yellow NMFA." Purchased transportation allows Yellow to add extra capacity to its network by hiring other companies to service existing customers to balance lanes and supplement capacity when Yellow is understaffed or unexpected demand creates urgent need. It is an expensive alternative to having the Company's own employees handle that freight, which the Company generally seeks to minimize, but it is necessary to ensure coverage and to not overburden its existing workforce. Purchased transportation is not used to "replace" an existing Yellow driver's work, and, in fact, there is a contractual grievance process in place to ensure drivers would be compensated were that to happen. The Union's decision to cut off Yellow's right to use purchased transportation was meant to further injure Yellow by making it more difficult for Yellow to operate its network. None of the Local Unions objected to Mr. Murphy giving notice that Yellow's future use of purchased transportation would not be permitted.

147.    On March 27, 2023, Mr. O'Brien visited a Yellow terminal in Detroit, Michigan and spoke to Yellow employees. He said that if Yellow went out of business, Yellow's 22,000 Teamster employees could simply find other jobs.

148.    On March 29, 2023, Murphy claimed the revised Phase 2 CHOPS, which the Union had earlier stated was its preferred alternative, violated the NMFA and resolved that TNFINC would not submit the revised Phase 2 CHOPS to a membership vote.

### 5.  The Union Tries to Extort Wage Increases from Yellow

149.    Moving the goal post yet again, and aware that the Union's ongoing block of One Yellow's Phase 2 implementation was causing Yellow's precarious financial situation to grow worse by the day, Mr. Murphy told Yellow that if it wanted to implement the revised Phase 2 CHOPS it would have to agree to reopen the NMFA and engage in collective bargaining for a new

agreement, at which point "TNFINC will put forth its own proposals and demands." As soon would become apparent, TNFINC's proposals and demands would center on one thing: immediate wage increases for IBT members,[6] which the Union has no right to require as a condition of approving CHOPS. In fact, linking the two was a breach of the NMFA.

150.    On March 30, 2023, Mr. Reifsnyder responded to Mr. Murphy, reiterating that implementation of One Yellow is essential to the success of Yellow's business, its customers, and its employees. Mr. Reifsnyder denounced the Union's last-minute attempt to block the proposed CHOPS, and highlighted that the Union's refusal to let its members vote on that strategy spoke volumes about how the Union believed those employees would vote.

151.    Mr. Reifsnyder also categorically rejected Mr. Murphy's suggestion that the proposed CHOPS was fatally flawed and violated the NMFA. The CHOPS was crafted based on Union recommendations and simply built on an existing agreement that had an outstanding track record of success over the fifteen years it has been in operation.

152.    So there could be no confusion on the point, Mr. Reifsnyder stated:

> Yellow has not agreed to cancel our hearing scheduled for next week. The IBT has sought unilaterally to cancel that hearing without justification – again, to derail this Change. The Change was mailed to the local unions and scheduled for a hearing, all in complete compliance with Article 8, Section 6 of our contract. The Union has no right – contractual or otherwise – to unilaterally cancel that hearing.

153.    On April 6, 2023, Yellow met with IBT General President O'Brien, General Secretary-Treasurer Zuckerberg, and National Freight Director Murphy, as well as other Union

---

[6] Under the current NMFA, Yellow has increased average wages by more than 20% overall since April 1, 2019. This does not include the additional $0.40 per hour increase scheduled for October 1, 2023. On average, a Yellow Teamster employee has a compensation package worth more than $90,000 annually.

representatives, at IBT headquarters to attempt to resolve the dispute amicably, despite the Union's unfounded positions and blatant breaches of the NMFA. During the meeting, the Union explicated that Phase 2 would not progress without two things: a reopening of the NMFA and significant monetary increases for IBT members. The Union has no right, and it is a breach of the NMFA, to demand wage increases as a *quid pro quo* for approving Yellow's operational changes.

154.    None of the Local Unions objected to the Union tying CHOPS approval to wage increases.

I.    **Yellow Prepares and Presents a Proposed Letter of Agreement, Which the Union Rejects, Insisting on Reopening the Yellow NMFA and "Significant Economic Improvements for the Members"**

155.    Still searching for a path forward on Phase 2, Yellow informed the Union it would expeditiously provide proposals for the Union's consideration.

156.    On April 7, 2023, Yellow presented a proposal to facilitate approval and implementation of Phase 2, titled "Letter of Agreement Regarding Yellow Corporation's Transformation to a Super-Regional Carrier" (the "Letter Proposal"). In the Letter Proposal, Yellow recognized that "the One Yellow transformation must be accomplished in a manner that respects the seniority rights of Yellow's Teamster-represented employees and minimizes modifications to the [Yellow NMFA]."

157.    Per the Union's guidance at the April 6 meeting, Yellow proposed, among other things, the following: (i) expansion of the Holland DTA; (ii) integrated operations and uniform dispatch procedure, meaning that Yellow's operations will be integrated and streamlined so that one driver will pick up and deliver on behalf of the family of brands; (iii) local cartage (dock/hostler) protection; (iv) greater follow-the-work opportunities; (v) limiting the Company's use of purchased transportation; (vi) rescheduling the CHOPS hearing to within fifteen days of

ratification of the agreement; and (vii) an effective date upon the occurrence of both ratification by affected bargaining unit employees voting and approval and implementation of the revised Phase 2 CHOPS.

158.    Mr. Murphy responded on April 10, 2023, concluding, without explanation, that the Letter Proposal was "unacceptable," adding that, if Yellow wished to proceed with Phase 2, it would have to agree to formally reopen the Yellow NMFA for negotiations and "include significant economic improvements for the members" as part of any new agreement.

159.    None of the Local Unions objected to Mr. Murphy's rejection of the Letter Proposal or Mr. Murphy's insistence on significant economic improvements for IBT members as a condition for approving Phase 2.

### J.    Yellow Opens Its Financial Repository to the Union

160.    Apart from the fact that it is a breach of the NMFA for the Union to tie approval of the Phase 2 CHOPS to wage increases for its members, Yellow is in no financial position to provide "significant economic improvements" to IBT members and certainly not without implementation of One Yellow and refinancing of its debt.

161.    To emphasize that point, and at the Union's insistence, on April 7, 2023, Yellow gave the IBT access to a repository of its key financial documents and offered to walk the IBT's economists through them to ensure they fully understood Yellow's current financial condition.

162.    Afterward, on April 14, 2023, Mr. Reifsnyder called Mr. Murphy to ask whether the Union had any feedback or questions concerning the information in the repository. Mr. Murphy called back that same day, telling Mr. Reifsnyder in no uncertain terms that the Union was not interested in discussing Yellow's situation.

163.     Several days later, on April 19, 2023, Mr. Murphy hosted a Teamsters Freight Division Update Call for Members at Yellow and reported, in his capacity as National Freight Director:

> At this point we have told the Company that it has two options. One, propose a change of operation that does not violate the contract. Or two, formally request to reopen the contract and negotiate in good faith, but that the Company will need to come up with sufficient financial improvements to do so. I don't know what the Company will do.

Mr. Murphy intoned: "As you've heard the General President say, 'The concession stand is closed.' I repeat, the concession stand is closed. This Company needs to manage itself and work within the contract. It is unfair and unjust for the Company to keep taking and threaten us if we don't give more." Mr. Murphy explained the decision of Messrs. O'Brien and Zuckerman to cancel the CHOPS hearing as the IBT looking out for the best interests of the local unions: "The change of operations hearing was cancelled because it didn't make sense to have over 100 Locals travel for multiple days to hear a change of operation that was improper in the first place and which was overwhelmingly opposed by the Locals." He encouraged the local unions to try to build a case against Yellow: "I want every local union to be on guard and be prepared to file unfair labor practice charges if the Company seeks to bargain directly with the Members."

## K.     Yellow Agrees to Reopen the NMFA, and the Union Insists It Be Allowed to Strike

164.     Yellow never agreed that under the NMFA, implementation of Phase 2 warrants reopening the NMFA or agreement to wage increases. But in recognition of the need to implement One Yellow as soon as possible, at a meeting on April 21, 2023, the Yellow Board of Directors approved reopening the NMFA early. It did so, however, on the express condition that negotiations occur and conclude within weeks.

165.    On April 25, 2023, Mr. O'Brien sent a letter to Mr. Hawkins, "[t]o set the record straight" that TNFINC did not offer to reopen the contract, but rather invited Yellow to request to reopen the agreement and agree that it would "also be required to provide significant economic improvements to the membership." Mr. O'Brien questioned whether Yellow would agree to "immediate tangible economic improvements (i.e. wage increases)" if the agreement were reopened. Mr. O'Brien also asked whether the Company would "agree that any reopening would constitute a 'true' reopener for all purposes and that TNFINC would have its full ability to negotiate economic terms and conditions as well as all other terms and conditions of employment, secured by its ability to use economic weapons in support of its demands should it be necessary."

166.    None of the Local Unions objected to Mr. O'Brien insisting that Union approval of Phase 2 was tied to wage increases.

167.    On April 26, 2023, Mr. Murphy issued a memorandum to "Yellow Local Unions," accusing Yellow of "essentially cherry pick[ing] from certain operational concessions it received at Holland over a decade ago." Mr. Murphy concluded that the CHOPS violated NMFA supplements and local agreements, and he repeated his earlier justification of Messrs. O'Brien and Zuckerman's unilateral cancelation of the CHOPS hearing: "The Change of Operations hearing was cancelled because it didn't make sense to have over 100 locals travel for multiple days to attend a change of operations that was improper, and which was overwhelmingly opposed by the Locals."

168.    Mr. Murphy reported that the Union told Yellow it had two options: (i) propose a CHOPS that did not (in the Union's revisionist history) violate the contract; or (ii) formally request to reopen the contract and negotiate in good faith, knowing that "the Company will need to come up with significant financial improvements to do so." Mr. Murphy explained that Mr. Hawkins

had sent a letter to Mr. O'Brien seeking to reopen the contract, to which Mr. O'Brien replied, asking whether the Company was prepared to engage in a true reopener "where all items are negotiable and . . . the Company is prepared to provide tangible economic benefits for the members."

169.    None of the Local Unions objected to Mr. Murphy insisting that Union approval of Phase 2 was tied to significant financial improvements for IBT members.

170.    On May 4, 2023, the Union said it accepted Yellow's request to formally re-open the NMFA (ignoring that it was the Union's demand, not Yellow's request), but only if Yellow agreed that: (i) as of August 1, 2023, the Yellow NMFA is formally reopened with respect to all of Yellow's companies and terms, including "economics"; (ii) the parties are permitted "use of their economic weapons (e.g., strike/lockout)"; and (iii) all agreed-upon terms will be submitted for membership ratification in accordance with the IBT Constitution. Mr. Murphy stated that TNFINC would be available to commence bargaining on August 1, 2023.

171.    None of the Local Unions objected to the Union insisting that its approval of Phase 2 depended on a formal reopening of the NMFA, including economics, on Yellow agreeing that the Union could strike/lockout, and on membership ratification of the terms.

172.    On May 5, 2023, Mr. Reifsnyder responded to Mr. Murphy, agreeing to the second and third terms Mr. Murphy had proposed, but noting that "waiting until August to commence bargaining will not work under the circumstances as Yellow may not exist if we wait until then to start." Mr. Reifsnyder stated:

> Therefore, and as I have explained in my recent conversations and correspondence with you and other senior IBT leaders, negotiations need to begin as soon as possible. This is so because, as the Company's detailed financials demonstrate, which were made available to the Teamsters at your request weeks ago, Yellow faces a serious and immediate liquidity crisis. While we appreciate that

> the Teamsters are presently engaged in large-scale negotiations with other companies, including two of Yellow's competitors, and that the Teamsters may need some lead time to prepare for these negotiations, we, collectively, cannot afford to wait until August and must get to the table now not later.

173.    Mr. Reifsnyder confirmed Yellow's readiness and eagerness to commence negotiations as soon as possible, and that Yellow is "prepared to do whatever it takes to ensure that both parties are on the same page with respect to the urgency of [Yellow's] financial situation."

174.    Mr. Reifsnyder represented that the Company is prepared to dedicate all resources and personnel and that "The Company's financial team will meet with TNFINC's financial advisors anywhere, anytime." Acknowledging that the Union's finance team might be resource constrained due to involvement in other negotiations, Mr. Reifsnyder offered that the Company would pay for the Union to engage an outside advisor "to speed this along."

175.    Hammering home the message, Mr. Reifsnyder told Mr. Murphy: "The stakes are too high, and our timeline is too short. We must do whatever it takes to get to the table as soon as possible."

176.    On May 11, 2023, the IBT Freight Division held a rally in Chicago for Teamsters at Yellow and ABF Freight, which the IBT described in a Tweet as "FREIGHT TEAMSTERS FIGHT BACK!" The official IBT Twitter account also tweeted "Yellow #Teamsters are gearing up for a contract fight later this year after the union rejected the company's proposed change of operations in March."

### L.    Yellow Meets with TNFINC's Economist to Discuss Yellow's Economic Condition, and the Union Continues to Insist on Wage Increases

177.    In a May 15 letter, Mr. Murphy acknowledged that TNFINC had made an information request concerning Yellow's economic condition, which Yellow's finance people were meeting with TNFINC's economist that day to discuss. But Mr. Murphy also maintained that

the collective bargaining agreement had not been reopened because Yellow did not agree to all of the conditions Mr. Murphy had imposed in his May 4 letter.

178.    Also on May 15, 2023, Moody's downgraded Yellow's ratings—the corporate family rating, the probability of default rating, the senior secured rating, and the speculative grade liquidity rating. Moody's explained:

> The downgrade of Yellow's ratings reflects Moody's expectations that delays in implementing the next phase of the company's "One Yellow" strategic plan and weaker sector fundamentals will slow expected improvements in operatin [*sic*] results, limit liquidity and increase uncertainty regarding the company's ability to successfully address its 2024 debt maturities.
>
> Yellow is engaged in discussions with union representation, which has pushed back on implementation of the next phase of Yellow's operating strategy. However, timing on when discussions may be resolved remains undetermined. Moody's believes progress on integrating and transforming its network under its "One Yellow" strategy is critical to improving the company's operating performance, especially during a challenging freight environment in 2023. Yellow has already successfully implemented network changes within its smaller western US network, which should serve as a blueprint to execute the broader initiative across the eastern US.

179.    On May 25, 2023, Mr. Reifsnyder and labor counsel for Yellow met with Mr. Murphy, the rest of the Freight Division leadership, IBT counsel, and an IBT economist in Kansas City, Missouri. During that meeting, Mr. Murphy reiterated, in ongoing breach of the NMFA, the Union's demand that, in order to support any One Yellow Phase 2 CHOPS, Yellow would need to agree to pay an immediate and upfront $1.50 per hour wage increase.

**M.    Yellow Drafts a New Letter of Agreement, with a Wage Proposal, Which the Union Rejects and Calls "Offensive"**

180.    Now just weeks away from a potential liquidation, with One Yellow continuing to be held hostage by the Union, with Yellow losing $24,000,000 in adjusted EBITDA every month,

and with One Yellow at an impasse, Yellow had little choice left but to capitulate to the Union's ransom demand.

181.    On May 29, 2023, Yellow convened an emergency meeting of its Board of Directors, and the Board authorized Yellow management to offer the Union a wage increase in exchange for the IBT's approval of a CHOPS to enable implementation of Phase 2 of One Yellow.

182.    On May 30, 2023, consistent with its Board authorization, Yellow sent the Union a new proposed Letter of Agreement ("LOA") regarding the Phase 2 CHOPS. In the new LOA, Yellow offered to make adjustments to the NMFA's hourly wage and mileage rates, but qualified the offer by explaining that without a restructuring or refinancing of the Company's existing debt or the successful procurement of bridge financing that can support such wage increases until the Company's existing debt can be restructured or refinanced, the Company does not have the means to pay the proposed increases. Nonetheless, in the interest of advancing the parties' discussion as quickly as possible, the Company made the wage proposal on a conditional basis while it pursued simultaneous discussions with its lenders. Yellow explained that if the requisite financing could not be obtained, the Company would be compelled to withdraw or modify the wage proposal.

183.    On June 5, 2023, TNFINC, in a letter from Mr. Murphy to Mr. Reifsnyder, unequivocally rejected Yellow's LOA, which had included a wage increase.

184.    Also on June 5, 2023, Mr. Murphy issued a memorandum to Yellow Local Unions regarding "Yellow Update." In that memorandum, Mr. Murphy summarized and attached the LOA, characterizing Yellow's efforts to save itself and its 22,000 Teamster jobs as "offensive," and maintained IBT leadership's hard-line demand that Yellow agree to substantial wage increases in exchange for the Union's cooperation: "We also repeatedly made clear to the Company that it would need to provide substantial economic improvements for the members if the parties did

reopen the contract early." Mr. Murphy concluded: "Suffice it to say, when the language of the proposed LOA is read carefully and whatever 'feel-good' verbiage is removed, the LOA is a one-way street in favor of the Company. As such it is a non-starter and the Company's conduct is offensive."

185.    On June 7, 2023, the official Teamsters Twitter account (@Teamsters) tweeted that Mr. Murphy "delivered an important updated [*sic*] on Tuesday with thousands of Freight Teamsters to discuss the ongoing situation at Yellow Corp." and included a Teamsters graphic that says "The concession stand is closed."

**N.     While Yellow Tries to Save Itself, Mr. O'Brien Taunts Yellow**

186.    The next day, on June 8, 2023, Mr. O'Brien tweeted from his Twitter account (@TeamstersSOB) "ONE UNION NOT ONE YELLOW" and then added a juvenile insult aimed at Yellow's Chief Executive Officer, referring to him as Yellow's "Chief Incompetent Officer." As Mr. O'Brien slung schoolyard insults, 22,000 of his members got one day closer to losing their jobs.

187.    On June 12, 2023, Mr. O'Brien disseminated a video message on Facebook. In addition to telling lies—*e.g.*, falsely stating that "the company's operational changes would have decimated thousands of Teamsters jobs" and that "[t]he Teamsters were willing to work with Yellow to reopen the contract and negotiate in good faith, but Yellow was not interested in this"—Mr. O'Brien admitted his contempt for Yellow and its executives (including by name-calling) and his and the Union's ambivalence about the Company's survival:

> Our Members have sacrificed so much already. They have sacrificed enough, sometimes a bad job isn't worth it anymore, and Teamsters at Yellow spoken, loud and clear. . . . The sad reality today is, there comes a point where you have to cut your losses. Yellow has shown that it doesn't deserve and cannot be expected to continue under its current structure. One Yellow won't solve management problems.

> The Teamsters cannot and will not keep bailing out this company with concessions. We are not interested in helping its corporate executives save face. This is the direction we are taking. Between handouts from the government and constant concessions from our Members. The time has come for the Teamsters to take a stand. Our Union has paid. The government has paid. Now it's time for Yellow to pay.

188.    On June 13, 2023, Mr. O'Brien tweeted from his account to take shots at Yellow and its CEO:

> "Do Nothing Darren", aka Chief Incompetence Officer of @Yellow has a lot to say in public about the @Teamsters.
>
> After his lies & misconceptions..I shot him a text. No response…no surprise..Tell the truth and do everyone a favor..RESIGN!

The tweet was followed by an image of a purported text of the clown emoji to Mr. Hawkins.

189.    At the same time, in an effort to save the 30,000 jobs that are at stake, Yellow reached out to members of the Biden Administration to apprise the Administration of the situation with the Union and seek its assistance in getting the Union back to the negotiating table. During this outreach, the Biden Administration was informed of the loss of tens of thousands of jobs, the damage to America's already fragile supply chains, and the anti-competitive impact that would result from Yellow's closure. The Administration was specifically informed that the loss of Yellow would have significant negative economic impact, beyond just the loss of its $5 billion in annual revenue and 30,000 jobs. Indeed, economic estimates suggest that Yellow's operations contribute $34 billion in additional economic activity on an annual basis, and that Yellow's operations create an additional 57,390 jobs in the economy. If Yellow goes out of business, 87,390 families could potentially be negatively impacted.

190.    The Biden Administration was further advised that, given Yellow's size and criticality to the LTL freight shipping sector, the loss of its capacity in the system would be unprecedented and send shock waves through numerous critical supply chains. In the immediate

aftermath of Yellow's closure, upwards of 90,000 LTL shipments would be stranded, and that number would grow daily as capacity leaves the system and shippers scramble to find alternatives. At the same time, the loss of Yellow's freight-handling capacity would dilute competition in the LTL freight sector and have the anti-competitive effect of enabling other LTL carriers to immediately increase their prices. Despite the Administration's efforts to encourage the Union to return to the negotiating table, Mr. O'Brien has rebuffed the White House's overtures.

191.    After Mr. O'Brien rebuffed White House overtures, Yellow reached out to the office of Senator Sanders to seek the Senator's assistance in getting Mr. O'Brien to the table to negotiate in good faith. Senator Sanders' office refused to assist Yellow in helping to save its 30,000 jobs, including its 22,000 good paying union jobs, or in preventing the devastating impacts Yellow's closure will have on American supply chains and the U.S. economy. According to Senator Sanders' representatives, Yellow is not the sort of company Senator Sanders wants to help because Yellow obtained relief under the CARES Act in the previous administration. Apparently, for Senator Sanders, political grudge matches are more important than saving union jobs or helping prevent negative impacts to the U.S. economy.

192.    Yellow has leveled with its employees that the Union is jeopardizing Yellow's continued viability by obstructing the implementation of One Yellow Phase 2. To blunt Yellow's message, the Union recently planted a representative in a meeting between Yellow and its employees. In a torrent of shouting and profanity, the representative repeated Mr. O'Brien's messages, distributed an O'Brien statement, and admitted that the Union does not care about Yellow or Teamsters jobs at Yellow because the Union is focused on UPS: "We have other more important things going on right now, as far as we're concerned, like ABF, like TForce, like UPS."

193.     In a tweet on June 24, 2023, Mr. O'Brien gloated about putting Yellow in the grave: "If 'Do Nothing Darren' continues he will single handily [*sic*] destroy a once honorable company … RESIGN NOW… Our members are done making bad investments…." The tweet included the image of an upright headstone, with the Yellow logo where the name of the deceased would typically appear, and the dates 1924-2023.

**O.     The Union Triggers a Potentially Devastating Death Spiral for Yellow**

194.     So far, in 2023, the Union's impediment of Yellow's implementation of Phase 2 has cost Yellow $137.3 million in adjusted EBITDA (and counting). At the same time, absent the completion of the One Yellow implementation and demonstration to the marketplace of the economic benefits it will provide, Yellow's ability to refinance its rapidly maturing debt will remain severely constrained. Quite simply, Yellow needs One Yellow completed as soon as possible, and Yellow needs those savings and revenue increases to resolve its serious cash constraints and refinance its debt before a $567.4 million Term Loan matures in June 2024 and a $729.4 million US Treasury Loan matures in September 2024.

195.     If the Union continues to stonewall Phase 2 in breach of the parties' agreement, Yellow estimates that it will run out of cash as early as mid-July 2023, and Yellow's creditors will likely force the Company into liquidation, which will result in the loss of 22,000 Union jobs, the loss of nearly 10,000 non-union jobs, the loss of more than $1.5 billion in enterprise value, and massive disruption to critical industrial, retail, and government supply chains across the United States.

196.     The financial markets have taken note as well. During Yellow's May 3, 2023 first quarter earnings call, institutional investors questioned the delay in implementing Phase 2 and the impact on Yellow's ability to refinance its outstanding debt. The Union's Sean O'Brien-led delay

in implementing Phase 2 of One Yellow has also caused S&P to downgrade Yellow's ratings in February 2023, Moody's to downgrade Yellow's ratings in May 2023, and S&P to indicate that it could lower Yellow's ratings again if it does not believe Yellow's refinancing plans will address its upcoming maturities before they become current. The Union's refusal to allow the CHOPS Committee to hear Yellow's Phase 2 proposal has also adversely affected Yellow by reducing customer confidence in Yellow's ability to timely deliver freight.

197.    In addition to holding the Union responsible for the significant damages it has caused and continues to cause, Yellow cannot survive further delay in implementing One Yellow and thus will no longer sit around waiting for the Union's cooperation as it bleeds out on the table. Nor can it or will it allow the Union, through its egregious and ongoing contractual breaches, to hold the implementation of One Yellow hostage for even one more day while it tries to extract ransom from Yellow in the form of wage increases. One Yellow must get done.

## IV.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT
### (AGAINST TNFINC, LOCAL NO. 696, LOCAL NO. 795, AND LOCAL NO. 41)

198.    Plaintiffs repeat, reallege, and incorporate by reference the foregoing allegations contained in paragraphs 1-197 above as if fully set forth herein.

199.    The NMFA is a valid, binding, and enforceable contract by and between plaintiffs YRC, Holland, New Penn, and Reddaway, on the one hand, and defendants TNFINC and the Local Unions (and other non-defendant local unions), on the other hand.

200.    While Yellow Corporation is not a signatory to the NMFA, it is an intended third-party beneficiary of the NMFA.

201.    Plaintiffs have performed their obligations under the NMFA.

202.     Plaintiffs are not required to exhaust contractual grievance procedures because they seek money damages that are unavailable through those procedures and because the Union's conduct constitutes repudiation, waiver, and estoppel of its right to compel compliance with those procedures.

203.     Defendants TNFINC and the Local Unions have breached their obligations under the NMFA, including by: (i) canceling the change of operations hearing set for April 5-7, 2023, (ii) refusing to reschedule a change of operations hearing, and (iii) requiring Yellow to agree to wage increases as a condition for approving changes of operations that should proceed in accordance with the NMFA without regard to any wage increases.

204.     By reason of the foregoing breaches of contract, plaintiffs have been damaged in an amount to be determined at trial, which includes the cost savings and revenue increases from Phase 2, as well as the delay in implementing Phase 3, that defendants TNFINC and the Local Unions have prevented them from realizing, and those damages continue to accrue.

205.     In addition, should Yellow be forced into liquidation as a direct and proximate result of defendants TNFINC and the Local Unions' breaches of the NMFA and persistent refusal to allow the implementation of One Yellow, defendants TNFINC and the Local Unions will be responsible for all resulting damages, including for the loss of the enterprise value Yellow would have had if One Yellow had been implemented on time.

206.     Plaintiffs are entitled to a judgment against defendants TNFINC and the Local Unions for their breaches of the NMFA in the amount of at least $137.3 million, plus interest thereon, costs, and attorneys' fees. In addition, because these orchestrated breaches, which were deliberately intended to inflict significant harm on Yellow, are particularly outrageous, Yellow is also entitled to punitive damages.

## COUNT II
## BREACH OF CONTRACT
## (AGAINST IBT)

207.    Plaintiffs repeat, reallege, and incorporate by reference the foregoing allegations contained in paragraphs 1-206 above as if fully set forth herein.

208.    The NMFA is a valid, binding, and enforceable contract by and between plaintiffs YRC, Holland, New Penn, and Reddaway, on the one hand, and TNFINC and the Local Unions, among other local unions, on the other hand.

209.    While Yellow Corporation is not a signatory to the NMFA, it is an intended third-party beneficiary of the NMFA.

210.    Plaintiffs have performed their obligations under the NMFA.

211.    Plaintiffs are not required to exhaust contractual grievance procedures because they seek money damages that are unavailable through those procedures and because the Union's conduct constitutes repudiation, waiver, and estoppel of its right to compel compliance with those procedures.

212.    Defendants TNFINC and the Local Unions have breached their obligations under the NMFA.

213.    Defendant IBT is liable for the contract breaches by TNFINC and the Local Unions because the IBT engaged in affirmative conduct to instigate, support, ratify, and encourage the other defendants to breach their obligations under the NMFA, and put the power of the IBT behind the other defendants' conduct, including by: (i) Mr. Zuckerman making the decision with Mr. O'Brien to cancel the CHOPS hearing set for April 5-7; (ii) Mr. Zuckerman broadcasting that the Teamsters would set terms and make demands; (iii) broadcasting that the IBT would do everything it could in connection with the Yellow CHOPS, including "secure improvements" for members, and threatening that the Teamsters "will go after [Yellow] with everything we've got";

(iv) directing the local unions and members to contact the National Freight Division about any assistance needed in connection with the Yellow CHOPS or any dispute with Yellow; (v) the Freight Division monitoring, and broadcasting that it was monitoring, Yellow's meetings with local unions in connection with the CHOPS process; (vi) communicating that the "[Freight] Division took a strong position with Yellow" and "advised local unions" to demand information from Yellow; (vii) the IBT generally and the Freight Division reporting on the Yellow CHOPS and issuing press releases commenting about it; and (viii) the IBT tweeting about the Yellow CHOPS.

214.    By reason of the foregoing breaches of contract, plaintiffs have been damaged in an amount to be determined at trial, which includes the forecasted cost savings and revenue increases from Phase 2, as well as the delay in implementing Phase 3, that defendants have prevented them from realizing, and those damages continue to accrue.

215.    In addition, should Yellow be forced into liquidation as a direct and proximate result of defendants TNFINC and the Local Unions' breaches of the NMFA and persistent refusal to allow the implementation of One Yellow, defendant IBT will be responsible for all resulting damages, including for the loss of the enterprise value Yellow would have had if One Yellow had been implemented on time.

216.    For its inducement of defendants TNFINC and the Local Unions' breaches of the Yellow NMFA, plaintiffs are entitled to a judgment against defendant IBT in the amount of at least $137.3 million, plus interest thereon, costs, and attorneys' fees. In addition, because these orchestrated breaches, which were deliberately intended to inflict significant harm on Yellow, are particularly outrageous, Yellow is also entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, plaintiffs respectfully request that this Court

grant the following relief:

    a.  An award of money damages against defendants, jointly and severally, in an amount to be determined at trial;

    b.  An award of punitive damages in an amount to be determined at trial;

    c.  An award of plaintiffs' costs and attorneys' fees incurred in connection with the commencement and prosecution of this action, as well as pre- and post-judgment interest at the prevailing statutory rates; and

    d.  Such other relief as the Court shall deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury on all of their claims.

Dated: June 27, 2023        Respectfully submitted,

*/s/ Daniel P. Johnson*
Trina R. Ricketts      KS #18697
Daniel P. Johnson     KS #27449
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
700 W. 47th Street, Suite 500
Kansas City, MO  64112
Phone:  816.471.1301
Facsimile:  816.471.1303
Email:  trina.ricketts@ogletree.com
Email:  daniel.johnson@ogletree.com

And

Marc E. Kasowitz (*Pro Hac Vice Forthcoming*)
Ronald R. Rossi (*Pro Hac Vice Forthcoming*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York  10019
Telephone:  212.506.1700
Facsimile:  212.506.1800
Email:  mkasowitz@kasowitz.com
Email:  rrossi@kasowitz.com

And

Maria Gorecki (*Pro Hac Vice Forthcoming*)
**KASOWITZ BENSON TORRES LLP**
1400 16th Street, Suite 400
Denver, Colorado  80202
Phone:  720.932.8303
Facsimile:  720.932.8300
Email:  mgorecki@kasowitz.com

**ATTORNEYS FOR PLAINTIFFS YELLOW CORPORATION, YRC INC. (D/B/A YRC FREIGHT), USF HOLLAND LLC, NEW PENN MOTOR EXPRESS LLC, AND USF REDDAWAY INC.**