## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

YELLOW CORPORATION, YRC INC., )
(d/b/a YRC Freight), USF HOLLAND LLC, )
NEW PENN MOTOR EXPRESS LLC, and )
USF REDDAWAY INC., )
)
        Plaintiffs, )
)
    v. )    Case No.:  6:23-cv-01131
)
INTERNATIONAL BROTHERHOOD OF )
TEAMSTERS, TEAMSTERS NATIONAL )
FREIGHT INDUSTRY NEGOTIATING COMMITTEE, )
TEAMSTERS LOCAL UNION NO. 696, )
TEAMSTERS LOCAL UNION NO. 795, and )
TEAMSTERS LOCAL UNION NO. 41, )
)
        Defendants. )

## MEMORANDUM IN SUPPORT OF THE INTERNATIONAL AND NEGOTIATING COMMITTEE'S MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Procedure, Defendants International Brotherhood of Teamsters (hereinafter "International") and the Teamsters National Freight Industry Negotiating Committee ("Negotiating Committee"), by their undersigned counsel, hereby submit this memorandum in support of their motion to dismiss the case.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a motion to dismiss, the court assumes that the factual allegations in the Amended Complaint are true and views them in a light most favorable to plaintiffs. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 679 (2009). But the court need not assume that legal conclusions disguised as factual allegations are true. *Id.*

Courts, typically, are tethered to the four corners of the Amended Complaint when they evaluate a Rule 12(b)(6) motion. *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020). There is an exception to this rule where courts will consider documents that are incorporated by reference or attached to the Amended Complaint. *Commonwealth Prop. Advocates, LLC v. Mortgage Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011).

Further, "if a plaintiff does not incorporate by reference or attach a document to [his] complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The logic behind this rule is intuitive: "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *Id.* at 1385. Also, there is no risk that Plaintiff will be unfairly surprised by such documents—and thus have no need to conduct further discovery—because "the plaintiff is obviously on notice of the document's contents…." *Id.*

Here, the Court can consider the 2019-2024 National Master Freight Agreement and its supplemental agreements (collectively, "NMFA") as well as the proposals and responses related to Plaintiffs' rebranding efforts. The Amended Complaint refers to the NMFA multiple times and both claims are based on alleged breaches of that agreement. [*See, e.g.*, Amended Complaint ¶ 9]. True and accurate excerpts from the NMFA are attached as Exhibit 1. True and accurate excerpts from the Central Region Over-the-Road Motor Freight Supplemental Agreement are attached as Exhibit 4. True and accurate excerpts from the Southern Region Area Over-the-Road Motor

Freight Supplemental Agreement are attached as Exhibit 5. True and accurate excerpts from the Carolina Freight Council Over-the-Road Supplemental Agreement are attached as Exhibit 6. Also included is the Reddaway agreement to be bound by the NMFA as Exhibit 2. Finally, this brief has attached the Rules of Procedure for the National Grievance Committee as Exhibit 3.

Similarly, the Amended Complaint references the proposals and responses related to Plaintiffs' rebranding efforts multiple times. The proposals are the heart of the parties' dispute because Plaintiffs are essentially alleging that Defendants' responses to the rebranding proposals violated the NMFA. [Amended Complaint ¶¶ 97, 108, 124, 156]. This brief has attached a true and accurate copy of Plaintiffs' May 30, 2023 proposed Letter of Agreement as Exhibit 7. It has also attached a true and accurate copy of the Change of Operation proposal for Minnesota terminals as Exhibit 9 and the Change of Operation decision from Phase I as Exhibit 10. Thus, the Court can consider these documents at this stage.

Finally, the Court can consider publicly filed court documents when evaluating a Rule 12(b)(6) motion. *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). Here, this brief cites a complaint and several briefs in a case filed against certain Plaintiffs where the Plaintiffs successfully argued that the NMFA's grievance procedure must be followed. This brief has attached Plaintiffs' brief in support of their motion to dismiss as Exhibit 8.

## FACTUAL ALLEGATIONS[1]

### I.     Background

#### A.     Parties

Plaintiff Yellow Corporation ("Yellow") is a holding company whose separate Plaintiff operating subsidiary companies run a large less-than-truckload shipping operation across North America. [Amended Complaint ¶ 41]. It has four operating subsidiaries that are also Plaintiffs: YRC, Inc., *d/b/a/* Yellow Freight ("Yellow Freight"), USF Holland, LLC ("Holland"), New Penn Motor Express, LLC ("New Penn"), and USF Reddaway, Inc. ("Reddaway"). *Id.* Yellow Freight, Holland, New Penn and Reddaway are referred to herein as the "Operating Companies."

On the other side of the case are five affiliated—but separate—entities. The International is an international labor organization. [*Id.* ¶ 46]. The Negotiating Committee is a bargaining committee that represents the Teamster local unions in negotiations with Plaintiffs. [*Id.* ¶ 47]. Teamsters Local 696, Teamsters Local 795, and Teamsters Local 41 (collective, "Local Defendants") are local unions affiliated with the International. [2] [*Id.* ¶ 48].

#### B.     The NMFA

The relevant collective bargaining agreement to this case is the NMFA. [*Id.* ¶ 9]. The NMFA is a multi-employer, multi-union contract whose signatory employers are the Operating Companies. [*Id.* ¶¶ 85, 86]. Approximately 150 autonomous local unions affiliated with the

---

[1] For purposes of this motion only, Defendants accept Plaintiffs' recitation of facts only for purposes of this motion to dismiss. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

[2] The sole reason for the Kansas Local Unions having been named as defendants in the Complaint appears to be that they are all located within this Court's jurisdiction so that Yellow can shop and place venue here, rather than where it is headquartered and principally conducts its business, namely, Nashville, Tennessee. The Locals are submitting a separate motion to dismiss discussing why the Complaint fails to allege a cause of action against them.

Negotiating Committee—including the Local Defendants—are signatory to the NMFA. [*Id.* ¶ 86]. The International and Yellow are not parties to the NMFA. [*See id.* ¶¶ 196, 200]. Three portions of the NMFA are relevant to this motion.

### 1.    Job Duties

The NMFA states that supplemental agreements are needed to describe the terms and conditions that apply to specific types of work classifications in the trucking industry. [Ex. 1 at 14 (Art. 2, Sec. 2(a)]. Relevant for this dispute, the supplemental agreements generally contemplate different types of employee classifications including road drivers, city pick-up and delivery, dock workers, utility employees mechanics and clericals. Road drivers, as the name implies, drive trucks to and from the Operating Companies' terminals. Dock workers load, unload, and organize shipments at the Operating Companies' terminals. Utility employees perform the duties of both drivers and dock workers and are considered Local Cartage drivers and not road drivers.

The supplemental agreements generally prohibit the Operating Companies from requiring road drivers from performing dock work. For example, the Central Region Over the Road Supplement of the NMFA expressly provides that road drivers "***covered by this agreement shall not be required to perform dock work or city pick-up and delivery service except as specifically permitted herein.***" [Ex. 4 at 3 (Art. 40, Sec. 3) (emphasis supplied)]. Similarly, the Southern Region Over-the-Road Supplement to the NMFA provides that "[e]mployees subject to this Agreement **shall not be permitted to perform dock work** or city pickup and delivery service where the performance of such work conflicts with the [separate] Local City Pickup and Delivery Agreement between the Employer and a Local Union affiliated with the I.B.T. and except as specifically permitted herein." [Ex. 5 at 3 (Sec. 6) (emphasis supplied)]. *See also* [Ex. 6 at 4–5 (Art. 40, Sec. 3)].

### 2.       Resolving Interpretation Disputes

The NMFA also contains a carefully crafted mandatory dispute resolution process. Specifically, NMFA Article 8 provides for a "National Grievance Procedure" that applies to "[a]ll grievances or questions of interpretations arising under this [NMFA] or Supplemental Agreements…."[3]  [Ex. 1 at 20]. Under this provision, questions about how to interpret the NMFA must be submitted to a permanent National Grievance Committee, which is comprised equally of employer and union representatives. [*Id.* at 21 (Art. 8, Sec. 1(b))]. The Grievance Committee's majority decisions are final and binding on all affected parties. [*Id.*]

Grievances deadlocked at the Grievance Committee proceed to the National Review Committee, consisting of the chairman of Negotiating Committee and the executive director of the NMFA employers' multiemployer bargaining representative or the chairman's an executive directors' the respective designees. [*Id.* at 22 (Art. 8, Sec. 2(b)1.)]. The Review Committee can resolve deadlocked cases by reviewing the record presented to the Grievance Committee, rehearing the dispute, or referring the case to a subcommittee. *Id.* The decision of the Review Committee is final and binding. [*Id.* at 23]. If the Review Committee cannot resolve a deadlock, the president of the employer involved and the chairman of Negotiating Committee have thirty (30) days to attempt to resolve the dispute. [*Id.* (Art. 8, Sec. 2(b)2.)].

### 3.       Change of Operations

NMFA Article 8 also contains a "change of operations" process. [*See id.* at 29 (Art. 8, Sec. 6)]. In summary, that process provides that "[p]resent terminals, breaking points or domiciles shall

---

[3] The rules and procedures governing the dispute resolution process under Article 8 are very detailed. NMFA Article 8's rules and procedures are set forth both in that article itself and in "Rules of Procedure for the National Grievance Committee established pursuant to NMFA Article 8."

not be transferred, changed or modified without the approval of an appropriate change of operations committee." [*Id.*] The change of operations process is primarily designed to address seniority and seniority-related issues stemming from terminal closures, relocations, consolidations, and mergers, of terminals of each separate operating company. [*See id.*] When such events are proposed, a change of operations committee is established. [*Id.*] The committee is authorized expressly to determine and issue final and binding decisions regarding the seniority rights of the affected bargaining unit employees. [*Id.* at 30.]

Change of operations committee procedures, from start to finish, are subordinated to the Grievance Committee. [*Id.* at 32 (Art. 8, Secs. 1(b) and 6(b))].  Moreover, like any other provisions of the NMFA disputes about the scope and application of the change of operations provisions fall within the broad national grievance procedure.[4]

## II.      **Current Dispute**

This dispute arises from Plaintiffs' attempt to rebrand its business by immediately combining its various operations of the Operating Companies without actually merging those companies. To properly explain how the parties arrived before the Court, Defendants explain what Plaintiffs proposed for their first two phases of their rebranding effort. Then, they describe how the Negotiating Committee responded to Plaintiffs' proposal to the second phase.

### A.      **Plaintiffs' Proposal for Rebranding**

Plaintiffs began their rebranding plan with Phase I in the Western Region of the United States. [Amended Complaint ¶ 76.a]. Phase I took advantage of the NMFA's "utility employee"

---

[4] Indeed, even a cursory review of the national grievance language reveals that there is absolutely no carveout from the broad grievance procedure for disputes about the meaning and intent of the change of operations procedure.

classification to have certain employees work on the dock. [*Id.* ¶ 98]. Phase I did not force "road drivers" to work on the dock. *See* Ex. 10

Plaintiffs' Phase II proposals are quite different. Specifically, the Operating Companies proposed a "change of operations" in which they sought to require "road drivers" to perform dock work in addition to their driving duties. [Amended Complaint ¶¶ 10, 16 n.2, 27]. This would fundamentally alter the job duties and functions of hundreds of "over-the-road" drivers[5] who are a distinct and specific NMFA job classification than dock workers. The Operating Companies also sought to apply a NMFA work rule agreement known as the "Holland Designated Terminal Agreement" applicable only to certain of Plaintiff Holland's drivers at certain terminals and impose it on the drivers employed by the separately operated Yellow Freight at certain of that company's terminals.

### B.   Negotiating Committee Responds to Phase II

In response to Plaintiffs' proposed change of operations, Negotiating Committee asserted that forcing the road drivers to work the dock violated express provisions of the NMFA with regard to Yellow Freight, New Penn, and Reddaway. [Amended Complaint ¶¶ 167–68]. The Negotiating Committee stated that the Operating Companies were improperly and inappropriately using NMFA's change of operations and that the Plaintiffs had to "work within the contract." [*Id.* ¶ 163]. Plaintiffs were advised that the Operating Companies had two options: "propose a change of operations that does not violate the contract[,]" or "formally request to reopen the contract and negotiate in good faith….." [*Id.* ¶ 163].

---

[5]Plaintiffs allege that it would affect approximately 600 road drivers. [*See* Complaint ¶ 27]. Plaintiffs callously suggest that the Defendants should sacrifice those jobs for the sake of the other employees and allow Plaintiffs to do what they will. *Id.*

Subsequently, Yellow and the Operating Companies submitted a proposed Letter of Agreement ("LOA") to the Negotiating Committee. [*Id.* ¶ 182]. The terms of the proposed LOA were much broader than even the proposed Phase II change of operations and would have significantly altered and weakened the protections contained in the entire NMFA. [*See* Ex. 7]. In the LOA, Plaintiffs proposed to obtain increased rights to subcontract certain work and limit the Negotiating Committee's current contractual ability to stop that subcontracting. The proposed LOA also subordinated all work rules, contractual provisions, supplemental agreements, and established practices to the amorphous "One Yellow" project, as determined solely by the Plaintiffs, thereby effectively gutting the NMFA. The proposed LOA also required approval of the terms of its previously proposed changes of operations as well as approval of a yet to be revealed "phase III" change of operations, as well as a reopening of the NMFA for immediate modifications. [*See id.*] After receiving the LOA, Negotiating Committee and the local unions it represents chose not to reopen the NMFA.

## III.    Procedural History

Having failed to secure the midterm contractual changes they seek, Plaintiffs filed this lawsuit pursuant to § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). [Amended Complaint ¶ 38]. The Amended Complaint alleges that Negotiating Committee and the Locals have breached the NMFA by cancelling a change of operations hearing regarding Plaintiffs' rebranding effort,[6] refusing to reschedule a change of operations hearing, and requiring Yellow to agree to wage increases as a condition for approving changes of operations. [*Id.* ¶ 203].

---

[6] The dispute between the parties to this Complaint does not involve the fact or even wisdom of Yellow's "One Yellow" rebranding effort. Yellow can rebrand itself however it wants to and use whatever nomenclature or color of the rainbow it chooses, but what it cannot do, however, is engage in a scheme that violates the NMFA.

Plaintiffs also claim that the International is liable for the alleged breaches by Negotiating Committee and the Locals because the International "engaged in affirmative conduct to instigate, conduct, support and encourage the other defendants to breach their obligations under the NMFA." [*Id.* ¶ 213].

Plaintiffs assert that they need not "exhaust contractual grievance procedures because they seek money damages that are unavailable through those procedures and because [Defendants'] conduct constitutes repudiation, waiver, and estoppel of [their] right to compel compliance with those procedures." [*Id.* ¶ 202]. Yellow joins these claims despite not being a party to the NMFA because it is allegedly a third-party beneficiary to the NMFA. [*Id.* ¶ 200].

## ARGUMENT

The dispute described in the Amended Complaint's 56 pages and 216 paragraphs of allegations is a simple one. Cutting through its public relations statements, one can see that what remains is a plain contract dispute. The contract at issue in this case—the NMFA and its related supplemental agreements—has a grievance procedure that the Amended Complaint acknowledges Plaintiffs have not exhausted. Further, two parties in this case—namely, Yellow and the International—are not signatory to the NMFA. Even if the Court believes that the alleged conduct involves the parties' bargaining obligations, the National Labor Relations Board has exclusive jurisdiction over policing such conduct. 29 U.S.C. § 158(d). As such, the Court should dismiss this case.

## I.   THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS BECAUSE THEY HAVE FAILED AND REFUSED TO EXHAUST THE MANDATORY CONTRACTUAL GRIEVANCE REMEDIES.

### A.   The NMFA's grievance procedures are binding and must be followed.

The entirety of Plaintiffs' complaint is predicated on an alleged breach of the NMFA by various of the Defendants. *Id.* ¶ 1. The failure to exhaust contractual remedies is a bar to litigation

that results in dismissal pursuant to Rule 12(b)(6). *See, e.g., Ortega v. N.M. Legal Aid, Inc.*, 643 F. App'x 774, 779–80 (10th Cir. 2016) (affirming dismissal of a breach of contract claim under Rule 12(b)(6) because the plaintiff failed to exhaust grievance procedure in collective bargaining agreement). Courts have refused to excuse exhaustion when parties argue that they cannot pursue damages in arbitration. *United Ass'n, Local No. 577 v. Ross Brothers Constr. Co.*, 191 F.3d 714, 718 (6th Cir. 1999). Because Plaintiffs have failed to exhaust the contractual dispute resolution machinery under the NMFA, their claims must be dismissed.

National labor policy strongly promotes the private resolution of labor disputes through the parties' chosen dispute resolution processes. *See* 29 U.S.C. § 173(d). "That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 566 (1960). As explained by the Supreme Court, "[a] collective bargaining agreement is an effort to erect a system of industrial self-government." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580 (1963). "[T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." *Id.* at 581.

To further this national labor policy, parties must exhaust their grievance remedies prior to filing a lawsuit alleging a breach of contract. R*epublic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). The Supreme Court in *Maddox* recognized that, in the labor context, "Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant." *Id*. at 653.

These principles apply equally to unions, employers and employees covered by a collective bargaining agreement. An employer, like a union or employee, must also exhaust required

contractual dispute resolution remedies before suing a union under LMRA § 301 for damages related to an alleged breach of a contractual provision in a collective bargaining agreement. *Drake Bakeries Inc. v. Local 50, Am. Bakery Workers Int'l*, 370 U.S. 254, 266 (1962). Joint grievance committees, like the Grievance Committee in the NMFA, are afforded the same deference and respect as traditional arbitration before a single arbitrator. *General Drivers, Warehousemen & Helpers Local Union, No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963).

Applying these cases, courts have dismissed cases that involved disputes to which the NMFA's grievance procedures applied. *See, e.g.*, *Pilot Freight v. Teamsters*, 659 F.2d 1252, 1255–57 (4th Cir. 1981). Indeed, Yellow Freight, Holland, and New Penn have successfully availed themselves of the *Maddox* Court's exhaustion requirement in defending against a suit for money damages filed against them (and the Teamsters) by an unrelated trucking company. *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 728 F.3d 853, 860–65 (8th Cir. 2013).

In the *ABF* case, ABF agreed to the NMFA's terms. *Id.* at 856. After Yellow Freight, Holland, New Penn, and the Negotiating Committee amended the NMFA, ABF sued various Teamster affiliated entities and Yellow[7] operating companies signatory to the NMFA, alleging that the Teamster and Yellow defendants breached the NMFA by negotiating different terms and conditions than ABF could receive. *Id.* at 856–57. ABF claimed hundreds of millions of dollars in monetary damages. Am. Complaint at 33 (¶ 161), *ABF v. Int'l Bhd. of Teamsters*, No. 2:10-cv-2165-SWW (W.D. Ark. Oct. 12, 2011), Doc. 107.

The Yellow operating defendants (as well as the Teamster defendants) in that case expressly and successfully argued that such a breach of contract claim must be brought through the grievance procedure under the NMFA (*i.e.*, the same procedure it now eschews). *See* Appellee Br. at 41–57,

---

[7] At that time Yellow Corp. was known as YRCW, Inc.

*ABF v. Int'l Bhd. of Teamsters*, No. 12-3090 (8th Cir. Dec. 21, 2012); [Ex. 8]. Having successfully advocated in favor of dismissal of the *ABF* complaint on exhaustion grounds in the *ABF* case, Plaintiffs' circumvention of the NMFA's dispute resolution provisions in this matter cannot legitimately be reconciled and should not be countenanced.

### B.      The NMFA's grievance procedures cover the Parties' dispute about Phase II.

To be sure, a party only needs to arbitrate those disputes that it has agreed to arbitrate.[8] *Warrior & Gulf Navigation*, 363 U.S. at 582. "An order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 582–83. Stated differently, "[i]n the absence of any express provision excluding a particular grievance from arbitration ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail...." *Id.* at 584–85.

Here, the NMFA's dispute resolution procedure is exceedingly broad and covers any and all claims for violations and interpretations of the NMFA. [*See* Ex. 1 at 20 (Art. 8, Sec. 1)]. The claims in this breach of contract case involve the interpretation and scope of contractual terms of art such as "change of operations" and interpretations of work jurisdictions across job classifications, work rules specific to each signatory company, as well as historical practices and the limitations thereof. The claims in this case are fraught with historical interpretations and practices unique to the freight industry covered by the NMFA. The NMFA's dispute resolution procedure is uniquely equipped and qualified to resolve the interpretation issues involved in this

---

[8] For example, the NMFA allows local unions to strike if an Operating Company becomes delinquent in its health & welfare or pension contributions without need to resort to the grievance mechanisms. [Ex. 1 at 24 (Art. 8, Sec. 3(b)].

case. Because Plaintiffs have failed to exhaust the contractual dispute resolution machinery under Article 8, Section 2 of the NMFA, their claims must be dismissed pursuant to Rule 12(b)(6).

Indeed, it is that dispute resolution process to which the parties expressly agreed in Article 8 of the NMFA. The Plaintiffs' efforts to circumvent the very process to which they agreed and which they have previously availed themselves of to obtain dismissal of a damage lawsuit against them should not be permitted and would do violence to established national labor policy and controlling Supreme Court precedent. In short, because Plaintiffs' claims are all exclusively based on an alleged violation of the NMFA, they must be dismissed for failure to exhaust the dispute resolution procedures under that agreement.

**C.    The equitable defenses raised by Plaintiffs are insufficient to prevent dismissal.**

Plaintiffs' claim that exhaustion is not required in this case, [*see* Amended Complaint ¶¶ 202, 211], is both unavailing and disingenuous in light of the *ABF* case and well-settled federal labor law. The Supreme Court has held broad arbitration clauses cover disputes about whether equitable defenses bar arbitration demands. *See Int'l Union of Operating Eng'rs, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 491 (1972) (requiring parties to arbitrate whether the issue of laches barred a demand to arbitrate). As noted above, the NMFA's grievance provisions are broadly written to cover any disagreement about how to interpret the NMFA.

The bald assertion that the Defendants have "repudiated" the change of operations process or "waived" the right to assert exhaustion is simply frivolous. Indeed, the parties attended a Grievance Committee hearing in Chicago on June 14, 2023, at which they actually approved a regional change of operations in Minnesota. [*See* Ex. 9]. Regardless, that argument assumes that Article 8, Section 6 requires automatic approval of the Phase II proposals—something that Defendants strongly dispute, particularly where as here the proposal violates other substantive

provisions of the NMFA. Further, Yellow has never attempted to file a grievance seeking a ruling on the propriety of its change of operations Phase II and chose instead to mount a public relations campaign targeted to its Teamster-represented employees in an effort to get them to pressure Negotiating Committee and the NMFA local unions to engage in and acquiesce to an improper and illegal change in operations proceeding designed to secure mid-term contractual changes. Any suggestion that the change of operations provisions are their own" grievance procedure is frivolous. As noted above, the change in operations provisions are like any other provision in the NMFA in that they are subject to the NGC if a dispute arises about their application and/or interpretation. Thus, the Court should dismiss this case because the grievance procedures provide the correct mechanism to resolve this dispute.

## II. IF THE COURT DOES NOT DISMISS THE CASE PENDING THE EXHAUSTION OF THE NMFA'S GRIEVANCE PROCEDURES, IT SHOULD DISMISS PLAINTIFF YELLOW AND THE INTERNATIONAL FROM THE CASE.

### A. The Amended Complaint insufficiently alleges that Plaintiff Yellow is a Third-Party Beneficiary to the NMFA.

Plaintiff Yellow is not itself party to the NMFA. Indeed, the NMFA expressly lists only the Operating Companies as parties to the agreement. [*See* Ex. 1 at 1; Ex. 2]. In recognition of its non-party status to the NMFA, Plaintiff Yellow baldly asserts that it is an intended third-party beneficiary of the NMFA. The Court need not accept this legal conclusion because the Amended Complaint contains insufficient allegations to maintain that status.

Courts are extremely reluctant to imply a "third-party beneficiary" status. "Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract." *Fasse v. Lower Heating & Air Conditioning, Inc*., 736 P.2d 930,

932 (Kan. 1987).[9] Moreover, "'the fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary.'" *Bridas v. Gov't of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001)).

In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *MCI Telecomms. Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). Unless an intention to contract or confer a direct benefit to a third party is clearly and fully spelled out, enforcement by the third party will be denied. *Id.* A court will generally not create a third-party beneficiary contract by implication. *Id.* Indeed, the International and the Negotiating Committee have found no cases that granted third-party beneficiary status to a non-signatory employer. *Cf. Peabody Coal Co. v. United Mine Workers of Am.*, 866 F. Supp. 1139, 1140 (S.D. Ind. 1993) (denying motion to add a non-signatory party as a plaintiff to a claim asserted under 29 U.S.C. § 185).

In the present case, the NMFA expressly identifies the specific entities that are covered by the agreement. Those entities are the Operating Companies. Yellow, the holding company of the Operating Companies, is conspicuously absent from being named as a covered entity. Nor do any provisions of the NMFA specify any benefits directed at Yellow. The Amended Complaint also contains no allegations that the contracting parties intended the NMFA to benefit Yellow. Its claims against the Defendants, therefore, must be dismissed.

---

[9] Courts may borrow from state law to interpret collective bargaining agreement to the extent that state law comports with federal labor policy. *See Sadiq v. Spirit AeroSystems, Inc.*, No. 07-1276-EFM, 2010 WL 11628797, at *5 (D. Kan. Jan. 26, 2010) (applying Kansas law to determine if the plaintiff was a third-party beneficiary to a collective bargaining agreement).

Finally, even if Yellow is an intended third-party beneficiary, it would not alter the fact that it failed to exhaust the mandatory dispute resolution process. *See LaSalle v. Elec. Workers*, 336 F. Supp. 2d 727, 729–31 (W.D. Mich. 2004). The reason for this is because a third-party beneficiary bringing a breach of contract claim is bound by all of the terms and conditions of the contract that it invokes. *See Trans-Bay Eng'rs & Builders v. Hills*, 551 F.2d 370, 378 (D.C. Cir. 1976) ("The [third-party] beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract."); *Lee v. Grandcor Med. Sys., Inc.*, 702 F. Supp. 252, 255 (D. Colo. 1988) ("A third party beneficiary must accept a contract's burdens along with its benefits. Moreover, a third-party party beneficiary may be bound by an arbitration agreement to which it has not expressly agreed."). S*ee also Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 (S.D.N.Y. 1997) (citing multiple cases supporting the proposition that a third-party beneficiary suing on a contract must observe the contract's arbitration requirements); *Wehe v. Montgomery*, 711 F. Supp. 1035, 1037 (D. Or. 1989) (finding arbitration provision in cash management account agreement binding on third-party beneficiary of agreement).

### B.   The Amended Complaint contains insufficient allegations against the International.

The International is not signatory to the NMFA. Recognizing this fact, the Amended Complaint instead asserts that the International instigated the alleged breaches by the Negotiating Committee and the Local Defendants. Amended Complaint ¶ 213. In an effort to bootstrap its claim against the International, Plaintiffs allege that the International instigated or procured the alleged breach. [*Id.*]. This effort fails as a matter of law. Specifically, Plaintiffs do not allege that the International breached the NMFA but instead claims that the International "engaged in affirmative conduct to instigate, support, ratify, and encourage the other defendants to breach their obligations under the NMFA[.]" [*Id.*]. Having failed to allege that the International itself violated

the NMFA, Plaintiffs' claims against it must be dismissed. *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Automobile, Aerospace & Agricultural Implement Workers of Am., Int'l Union*, 523 U.S. 653 (1998). Plaintiffs' "instigation" allegations against the International, are in any event not cognizable as LMRA Section 301 claims. In this regard, Plaintiffs' allegations are simply a re-packaged claim alleging that the International interfered with their contract and/or business relations. The Tenth Circuit, however, has held that LMRA Section 301 does not establish subject matter jurisdiction for federal common law claim of interference by a non-signatory to a collective bargaining agreement. *United Food & Commercial Workers Union, Local No. 1564 v. Quality Plus Stores, Inc.*, 961 F.2d 904, 906 (10th Cir. 1992).  Accordingly, Plaintiffs' claims against the International must be dismissed.

Moreover, the Amended Complaint's factual allegations against the International fail to support a claim.

For a century, courts have held that an international union is not "vicariously" liable for the actions or inactions of its affiliated entities. *See United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 395 (1922); *Coronado Coal Co. v. United Mine Workers of Am.*, 268 U.S. 295, 304–05 (1925). Instead, Plaintiffs must allege that the International "instigated, supported, ratified, or encouraged" the alleged breaches. *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 218 (1979) (quotation cleaned up). Citing these cases, courts have used Rule 12(b)(6) to dismiss claims against an international union under Rule 12(b)(6) because "the Complaint is devoid of any allegations that any official or agent of [the international] collaborate with [a local union's president] or in any way supported [the allegedly improper conduct]." *Massey v. Am. Fed'n of Gov't Emps.*, 196 F. Supp. 3d 25, 37 (D.D.C. 2016).

The Amended Complaint's allegations fail to plausibly support the assertion that the International procured the alleged breach. [Amended Complaint ¶ 213]. The cited actions, *id.*, are all actions taken by the Negotiating Committee or members of the Negotiating Committee or simply general labor statements by the International. The Amended Complaint contains no legitimate allegations that the International itself specifically provoked the Negotiating Committee to reject Plaintiffs' rebranding proposals.

### III.   TO THE EXTENT PLAINTIFFS COMPLAINS ABOUT THE DEFENDANTS' REFUSAL TO NEGOTIATE, PLAINTIFFS MUST BRING THOSE CLAIMS TO THE NATIONAL LABOR RELATIONS BOARD.

While the Amended Complaint claims the Defendants' refusal to approve Plaintiffs' proposed changes violates the NMFA, the allegations also seem to invoke the parties' bargaining obligations under the National Labor Relations Act ("NLRA"). *See* 29 U.S.C. § 158(a)(5), (b)(3). Indeed, the Amended Complaint spends numerous paragraphs complaining that the Defendants refused to meet to bargain and allegedly backtracked from previous offers. [*See, e.g.*, Amended Complaint ¶¶ 4, 30–31, 128, 137, 149].

However, when a collective-bargaining agreement is in effect, a party is under no obligation to consent to, or even discuss, proposed midterm modifications of a contractual term, unless the agreement provides otherwise. *Kellogg Co.*, 362 NLRB 736, 740 (2015). In the present case, the Amended Complaint and the documents upon which it relies shows that Plaintiffs sought to use the NMFA's change of operations process to obtain a wish list of contractual changes that are not available to them under that process and are instead obtainable only through collective bargaining. Although the Plaintiffs characterize the work rule changes that they want to secure outside of the required collective bargaining process as antiquated or contrary to efficient operations, [Amended Complaint ¶¶ 16 n.2, 27, 67], such denigration does not alter the fact that

those work rules were negotiated and agreed upon by the collective bargaining parties and included with the NMFA.

Plaintiffs are certainly free to negotiate for such changes in negotiations for a successor agreement. Plaintiffs, however, are attempting to circumvent the collective bargaining process and, in so doing, seek instead to obtain such changes immediately and unilaterally before and without having to engage in the "give and take" of legitimate bargaining for a successor contract in a few months.

The Court need not—and should not—weigh in on these matters because they come within the NLRB's exclusive jurisdiction. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982) ("As a general rule, federal courts do not have jurisdiction over activity which 'is arguably subject to § 7 or § 8 of the NLRA,' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959)) (alteration omitted)). In short, because the NLRB regulates the bargaining process, the Court should not entertain Plaintiffs' efforts to enmesh it in an illegal effort to obtain mid-term modifications to the labor contract.

## <u>CONCLUSION</u>

This press release masquerading as an Amended Complaint brings to the Court a contract dispute that must go through the applicable grievance mechanisms before the Court can even hear the case. Further, the Amended Complaint attempts to bring in parties who are not signatory to the NMFA. If one does not characterize the parties' disagreement as a contract claim, the NLRA wrests jurisdiction from the Court to hear it. These defects warrant dismissal under Federal Rule of Civil Procedure 12(b)(6).

Dated: July 20, 2023                                    Respectfully submitted,

_Michael E. Amash_____
Michael E. Amash, KS Bar No. 22998
Nathan A. Kakazu, KS Bar No. 28276
BLAKE & UHLIG, P.A.
6803 West 64th Street, Suite 300
Overland Park, Kansas 66202
Telephone: (913) 321-8884
Facsimile: (913) 321-2396
mea@blake-uhlig.com
nak@blake-uhlig.com

_Edward M. Gleason, Jr._____
Edward M. Gleason, Jr., Bar No. 429325
_Pro Hac Vice Pending_
General Counsel
International Brotherhood of Teamsters
25 Louisiana Ave, NW
Washington DC 20001
Telephone: (202) 624-6847
Facsimile: (202) 624-6884
egleason@teamster.org

_Richard W. Gibson_____
Richard W. Gibson, Bar No. 435485
_Pro Hac Vice Pending_
Staff Attorney
International Brotherhood of Teamsters
25 Louisiana Ave., NW
Washington, DC  20001
Telephone: (202) 624-6940
Facsimile: (202) 624-6884
rgibson@teamster.org


Counsel to the International Brotherhood of
Teamsters and Teamsters National Freight
Industry Negotiating Committee

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July 2023, the foregoing was filed electronically

with the United States District Court for the District of Kansas via the Court's CM/ECF system,

which will serve all registered users.

_s/Michael E. Amash_____