IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

YELLOW CORPORATION et al.,

    Plaintiffs,

    v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS et al.,

    Defendants.

Case No. 23-1131-JAR-ADM

## MEMORANDUM AND ORDER

Plaintiffs Yellow Corporation, YRC Inc. d/b/a YRC Freight, USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway Inc. filed this action on June 27, 2023, alleging breach of a collective bargaining agreement between Plaintiffs and Defendants International Brotherhood of Teamsters ("IBT"), Teamsters National Freight Industry Negotiating Committee ("TNFINC"), Teamsters Local No. 696, Teamsters Local No. 795, and Teamsters Local No. 41 (collectively with Teamsters Local 696 and Teamsters Local 795, the "Local Unions"). This matter is before the Court on IBT and TNFINC's Motion to Dismiss (Doc. 29), and the Local Unions' Motion to Dismiss (Doc. 31). Both motions seek dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Plaintiffs request oral argument in their responses to the motions to dismiss, which the Court denies because it would not materially assist the Court in deciding the motions. Therefore, the motions are ripe for decision and the Court is prepared to rule. As described more fully below, the Court grants the motions to dismiss based on failure to exhaust the grievance procedure in the parties' collective bargaining agreement.

**I.       Rule 12 Standards**

      **A.        Failure to State a Claim**

Under Rule 12(b)(6), "only a complaint that states a plausible claim for relief survives a motion to dismiss."[1]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[2]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[3]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all of the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[4]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[5]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[6]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7]

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[2] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

[3] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[4] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[5] *Id.* at 678−79.

[6] *Id.* at 679.

[7] *Id.* at 678.

B.     **Matters Outside the Pleadings**

Defendants attach several exhibits to their motions to dismiss. "The 'usual rule' is 'that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss,' . . . [but] 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"[8] Here, both parties attach to their briefs copies of the YRCW National Master Freight Agreement for the Period of April 1, 2019 through March 31, 2024 ("NMFA").[9] Plaintiffs' breach-of-contract claims are based on this contract; therefore, it is undisputedly central to the claims in this case. Plaintiffs dispute the authenticity of the NMFA versions attached to Defendants' motions because they are incomplete. Although Plaintiffs fail to identify which "key provisions" are missing, out of an abundance of caution, the Court considers the complete version of the NMFA attached to Plaintiffs' response to IBT and TNFINC's motion.[10] The Court also considers as central to the claims in this case USF Reddaway, Inc. ("Reddaway") adoption of the NMFA (Exhibit 2), and the NGC Rules of Procedure (Exhibit 3) attached to IBT and TNFINC's motion.[11] Plaintiffs do not dispute the authenticity of these two exhibits, and they are incorporated by reference in the NMFA and discussed in the Amended Complaint.

---

[8] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019) (alteration omitted) (first quoting *Alvarado v. KOB-TV, LLC*, 493 F.3d 1201, 1215 (10th Cir. 2007); and then quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

[9] Docs. 30-1, 32-1, 65-1.

[10] Doc. 65-1. To authenticate a document, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Here, neither party submits a declaration authenticating the exhibits. Nor are the exhibits submitted by the parties self-authenticating, as neither side submits a copy that includes notarized signatures. *See* Fed. R. Evid. 902(8). Because neither party disputes the authenticity of Plaintiffs' attached version of the NMFA, the Court will consider it. The Court further notes that Plaintiffs' attached version of the NMFA, while complete, includes highlighting and comments presumably added by one of the parties or counsel. The Court ignores these markings in deciding the motions.

[11] Docs. 30-2, 30-3.

Plaintiffs object to the Court's consideration of the remaining exhibits attached to Defendants' motions because they are either incomplete or not central to the claims in this case.[12] Defendants do not address this issue in the replies, so the Court declines to consider these exhibits because Defendants fail to show that they are central to the claims in this case and that their authenticity is not in dispute.[13]

## II.  Factual Allegations

The following facts are either alleged in the First Amended Verified Complaint ("Amended Complaint") and viewed in the light most favorable to Plaintiffs, or are derived from the exhibits referenced above that are central to the claims in the case.

Yellow Corporation ("Yellow") is a Delaware corporation with its principal place of business in Nashville, Tennessee.  Yellow operated a large less-than-truckload shipping operation across North America through the following four subsidiaries also named as Plaintiffs in this case: (1) YRC, Inc., d/b/a/ Yellow Freight ("Yellow Freight"); (2) USF Holland, LLC ("Holland"); (3) New Penn Motor Express, LLC ("New Penn"); and (4) Reddaway (collectively, "Yellow Operating Companies").

IBT is a labor organization and one of the nation's largest unions.  The TNFINC is a bargaining committee that represents the Teamster local unions in negotiations with Plaintiffs. The Local Unions are all affiliated with IBT.

The claims in this case arise out of the NMFA, a collective bargaining agreement ("CBA").  The Yellow Operating Companies employ most of their unionized employees under

---

[12] Docs. 30-4, 30-5, 30-6, 30-7, 30-9, 30-10, 32-2.

[13] Defendants ask the Court to take judicial notice of Exhibit 8 attached to IBT and TNFINC's memorandum in support of the motion to dismiss, and the fact that Yellow filed a Chapter 11 petition on August 6, 2023, in the U.S. Bankruptcy Court for the District of Delaware, Case No. 23-11069-CTG.  The Court need not rule on this request, because it is not necessary to consider these facts in ruling on the pending motions.

its terms. TNFINC negotiates the NMFA on behalf of the Local Unions and their IBT members, and Yellow negotiates on behalf of the Yellow Operating Companies. The parties to the NMFA are the Yellow Operating Companies,[14] the Local Unions, and the TNFINC. Neither Yellow nor IBT are parties to the NMFA.

The NMFA contemplates supplemental agreements that "provide[] for each of the specific types of work performed by the various classifications of employees controlled by this Master Agreement. All such Supplemental Agreements are subject to and controlled by the terms of this Master Agreement."[15] Article 8 of the NMFA contains grievance requirements. Article 8, Section 1 provides, in part:

> (a) All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement (or factual grievances arising under the [NMFA]), shall be processed in accordance with the grievance procedure of the applicable Supplemental Agreement.
>
> . . . .
>
> Any request for interpretation of the [NMFA] shall be submitted directly to the Regional Joint Area Committee for the making of a record on the matter, after which it shall be immediately referred to the National Grievance Committee. Such request shall be filed with both the Union and Employer secretaries of the National Grievance Committee with a complete statement of the matter.
>
> (b) Any matter which has been referred pursuant to Section 1(a) above, or any question concerning the interpretation of the provisions contained in the [NMFA], shall be submitted to a permanent National Grievance Committee which shall be composed of an equal number of employer and union representatives. . . . The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report,

---

[14] The NMFA lists Yellow Freight, New Penn, and Holland as parties. According to the Amended Complaint, Reddaway was not a signatory to the NMFA in 2019, but it agreed to become a signatory in June 2021, retroactive to April 1, 2021. Doc. 21 at 24 n.4; Doc. 30-2.

[15] Doc. 65-1 at 4 (NMFA, art. 2, § 2(a)).

5

> with the final decision or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves the dispute by a majority vote of those present and voting, such decisions shall be final and binding upon all parties.[16]

Section 2 governs the National Grievance Committee procedures. With respect to questions of interpretation under the NMFA,

> [t]he National Grievance Committee by majority vote shall have the authority to reverse and set aside all resolutions of grievances by any lower level grievance committee or review committee involving or affecting the interpretation(s) of Articles 1-39 of the [NMFA], in which case the decision of the National Grievance Committee shall be final and binding.[17]

If the National Grievance Committee is unable to reach a majority decision, the lower level grievance or review committee decision stands, and becomes final and binding.

Sections 3, 4, and 5 of Article 8 discuss the grievance requirements that pertain to work stoppages.

Under the "NGC Rules of Procedure" referenced in the NMFA, the National Grievance Committee has jurisdiction over, *inter alia*, "[q]uestions concerning interpretation of the provisions of the [NMFA], as provided in Article 8, Section 2."[18] Unlike certain other types of grievances, "[t]he National Review Committee shall not have jurisdiction over cases heard and deadlocked by the National Grievance Committee which were considered pursuant to Article 8, Section 2(a)."[19]

---

[16] *Id.* at 44–45 (NMFA, art. 8, § 1(a)–(b)).

[17] *Id.* at 46 (NMFA, art. 8, § 2(a)).

[18] Doc. 30-3 at 2 (NGC Rules, art. II, ¶ (A)(2)).

[19] *Id.* at 4 (NGC Rules, art. III, ¶ (B)).

Plaintiffs allege in the Amended Complaint that Defendants were required by the NMFA to cooperate with Plaintiffs on the One Yellow restructuring initiative. Plaintiffs describe this initiative as

> involv[ing], in carefully planned phases, the merger of Yellow's four operating subsidiaries . . . into a freight carrier that will eliminate inefficiencies, including inefficiencies arising from competition between its subsidiaries for the same jobs, and create a super-regional carrier operating as one company, with one network, under a single Yellow brand.[20]

Plaintiffs allege two claims for breach of the NMFA under Section 301 of the Labor Management Relations Act ("LMRA"),[21] based on Defendants' refusing to resolve seniority issues arising from Phase 2 of the One Yellow initiative, refusing to engage in the change of operations procedure ("CHOPS"), and requiring Plaintiffs to agree to wage increases as a condition for approving changes of operations. Count 1 alleges breach of contract against all Defendants except IBT. Count 2 alleges breach of contract against IBT on the theory that it instigated, ratified, and encouraged the other Defendants to breach the NMFA.

**III.  Discussion**

Plaintiffs allege in the Amended Complaint that the grievance procedure in the NMFA does not apply to them because "they seek money damages that are unavailable through those procedures and because the Union's conduct constitutes repudiation, waiver, and estoppel of its right to compel compliance with those procedures."[22] Defendants move to dismiss for failure to exhaust the grievance procedure required by the NMFA, and Plaintiffs respond that they were not required to grieve, and that even if they were, they are excused from the grievance process.

---

[20] Doc. 21 ¶ 2.

[21] 29 U.S.C. § 185.

[22] Doc. 21 ¶¶ 202, 211.

7

Because the Court finds dismissal is warranted for failure to exhaust—a threshold issue—it does not reach the other grounds for dismissal raised in Defendants' motions to dismiss.

### A.     Exhaustion Requirement for LMRA Claims

This case arises under the LMRA.[23]  CBAs like the NMFA "commonly contain grievance procedures, which the [Supreme] Court has emphasized are '[a] major factor in achieving industrial peace' and lie 'at the very heart of the system of industrial self-government.'"[24]  "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress."[25]  As the Supreme Court acknowledged in *Republic Steel Corp. v. Maddox*, "Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant."[26]  Grievance provisions are equally binding on the employer if the parties' agreement so provides.[27]

### B.     Coverage of Plaintiffs' Claims

The parties initially dispute whether Plaintiffs' LMRA claims in this case fall within the purview of the NMFA's grievance provisions.  Indeed, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to

---

[23] 29 U.S.C. § 185.

[24] *Ortega v. N.M. Legal Aid, Inc.*, 643 F. App'x 774, 778 (10th Cir. 2016) (second alteration in original) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 578, 581 (1960)).

[25] *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965) (footnote omitted).

[26] *Id.* at 653 (citing 29 U.S.C. §§ 173(d), 171(c)).

[27] *Drake Bakeries, Inc. v. Loc. 50, Am. Bakery & Confectionery Workers Int'l*, 370 U.S. 254, 257 (1962) (explaining that scope is determined by the language of the contract, and considering similarly broad language in a CBA as covering claims by employer); *see also United Nat. Foods, Inc. v. Teamsters Loc. 414*, 58 F.4th 927, 934–35 (7th Cir. 2023) (finding grievance and arbitration process set forth in CBA only applied to employee grievances, and contrasting it with the broader CBA language in *Drake Bakeries*).

submit."[28]  Yet, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage."[29]  The presumption in favor of arbitrability "is particularly applicable" to broad arbitration clauses.[30]  "In such cases, '[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'"[31]

Defendants point to Article 8, Section 1 and argue that it broadly requires arbitration for "[a]ll factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement (or factual grievances arising under the [NMFA])," and that "[a]ny request for interpretation of the [NMFA] shall be submitted directly to the Regional Joint Area Committee . . . after which it shall be immediately referred to the National Grievance Committee."[32]  They argue that Plaintiffs' claims require interpretation of the NMFA and its supplemental agreements, including the NMFA's CHOPS provisions, interpretations of work jurisdictions across job classifications, work rules specific to each signatory company, and historical practices that are unique to the freight industry.

Plaintiffs respond that under the NMFA, damage actions need not be grieved unless they concern work stoppage.  In support of this position, Plaintiffs point to Article 8, Section 4, which they claim distinguishes between questions of contract interpretation and damage actions where

---

[28] *Warrior & Gulf Navigation Co.*, 363 U.S. at 582.

[29] *Id.* at 582–83.

[30] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

[31] *Id.* (alteration in original) (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 584–85).

[32] Doc. 65-1 at 44–45 (NMFA, art. 8, § 1(a)).

9

there is a work stoppage. Because their claims are not based on work stoppage, Plaintiffs argue that they are not required to grieve. The Court disagrees that Section 4 changes the broad grievance mandate in Section 1 for disputes about contract interpretation.

The Court is guided by the language of the NMFA.[33] Article 8, Section 1(a) is clear that "all" factual grievances, or questions of interpretation, arising under the NMFA or supplemental agreements must first go through the grievance process of the applicable supplemental agreement. This provision applies to all parties. Section 1(a) also specifically provides for contract interpretation disputes to be referred to the Regional Joint Area Committee in order to develop a record, and then requires that the dispute be "immediately referred" to the National Grievance Committee. Sections 1(b) and 2(a) then explain how the matter should proceed once referred to the National Grievance Committee. If the National Grievance Committee resolves the dispute, its decision "shall be final and binding upon all parties."[34] There is no language in these provisions precluding the grievance committees from awarding damages.

Sections 3, 4, and 5 concern work stoppages. Section 3(a) reiterates: "The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination."[35] It then explains the rules governing work stoppages and unauthorized strikes. As part of its lengthy provisions on these subjects, the NMFA contains grievance procedures in Section 4(b). The specific types of disputes listed in this subsection "shall be submitted to the grievance procedure at the national

---

[33] *See, e.g.*, *AT&T Techs., Inc.*, 475 U.S. at 651 ("It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances . . . ."); *Nat'l Nurses Org. Comm. v. Midwest Div. MMC, LLC*, 70 F.4th 1315, 1318 (10th Cir. 2023) (citation omitted) (same).

[34] Doc. 65-1 at 45 (NMFA, art. 8, § 1(b)).

[35] *Id.* at 48 (NMFA, art. 8, § 3(a)).

10

level, prior to the institution of any damage suit action."[36]  If a dispute under Section 4(b) proceeds past the National Grievance Committee under these provisions, it goes to the National Review Committee.

> If the National Review Committee decides that a strike was unlawful, it shall not have the authority to assess damages.  Except as provided in this subsection 4(b), agreement to utilize this procedure shall not thereafter in any way limit or constitute a waiver of the right of the Employer or Union to commence damage suit action.[37]

This language in Article 8, Section 4 is not "forceful evidence" that the parties intended to carve-out all damage suits other than those for work stoppage from the broad language in Section 1 and elsewhere requiring the parties to exhaust the grievance procedure for factual grievances and questions of NMFA interpretation.[38]  The language about damage suits relied on by Plaintiffs applies to issues specifically addressed in Sections 3 and 4 regarding improper strike activity.[39]  There is no express provision excepting from the broad grievance provisions in Sections 1 and 2 claims for damages that do not involve work stoppage.[40]  Section 1 provides no

---

[36] *Id.* at 52 (NMFA, art. 8, § 4(b)).

[37] *Id.*

[38] *See AT&T Techs., Inc.*, 475 U.S. at 650.

[39] *See id.* at 51–53 (NMFA, art. 8, § 4(b)) (setting forth national grievance procedure for "[t]he question of whether the International Union, [TNFINC], Joint Council or Local Union have met its obligation set forth in the immediately preceding paragraphs, or the question of whether the International Union, [TNFINC], and Joint Council or the Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of this Agreement by calling, encouraging, assisting or aiding such work stoppage, etc., in violation of this Agreement, or the question of whether an authorized strike provided by Article 8, Section 3(a), (b) or (c) is in violation of this Agreement, or whether an Employer engaged in a lockout in violation of this Agreement.").

[40] *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85 (1960) ("[T]he court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator."); *Soc'y of Pro. Eng'g Emps. in Aerospace, Int'l Fed'n of Pro. & Tech. Emps., Loc. 2001 v. Spirit Aerosystems, Inc.*, 681 F. App'x 717, 722–23 (10th Cir. 2017) (finding coverage in part because there was no express provision removing the plaintiff's grievance from the grievance process).

11

cross-reference to Section 4, nor any other language indicating that the grievance procedure only applies to claims for damages that involve work stoppage. Thus, the Court cannot determine with "positive assurance" that the broad grievance clause in Section 1 is not susceptible of an interpretation that covers Plaintiffs' claims, and to the extent there is any doubt, it is resolved in favor of coverage.[41] Accordingly, the Court finds that Plaintiffs' claims are covered by the grievance provisions in Article 8, Section 1.

### C. Exceptions to Exhaustion

Plaintiffs assert that even if their claims are subject to exhaustion, they should be excused for two reasons: (1) the grievance process cannot provide them with the damage remedy they seek; and (2) exhaustion would be futile. The Court addresses each in turn.

#### 1. Insufficient Remedy

Plaintiffs first assert that because the grievance process cannot provide them with the relief they seek they should be excused from exhausting. Plaintiffs reiterate their argument on coverage—that the grievance procedure only applies to damage suits that involve work stoppage—and assert that because they could not obtain monetary damages if they prevail in the grievance process, they should not be required to first grieve underlying questions of contract interpretation before bringing suit. For the reasons explained above, the Court does not agree that the grievance requirement in the NMFA only applies to damage suits involving work stoppages. Plaintiffs' breach-of-contract claims fall squarely within the broad grievance mandate in Article 8, Section 1 of the NMFA because they involve factual grievances and require interpretation of the NMFA and/or its supplemental agreements.

---

[41] *See United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Loc. No. 577 v. Ross Bros. Constr. Co.*, 191 F.3d 714, 717–18 (6th Cir. 1999) (rejecting employer's argument that broad grievance provision did not apply to damage claims because it was not specifically provided for in the collective bargaining agreement).

Moreover, the Court does not find support in the NMFA for Plaintiffs' assertion that they could not obtain a "final and binding" decision on contract interpretation through the grievance procedure. Plaintiffs claim that questions of contract interpretation presented to the National Grievance Committee under Article 8, Section 2 are not final and binding, and that no further review is permitted. But Section 2 states that the National Grievance Committee

> by majority vote shall have the authority to reverse and set aside all resolutions of grievances by any lower level grievance committee or review committee involving or affecting the interpretation(s) of Articles 1-39 of the [NMFA], in which case the decision of the National Grievance Committee shall be final and binding.[42]

If the National Grievance Committee is unable to reach a decision, "the decision of the lower level grievance committee or review committee shall stand as final and binding."[43] This language does not support Plaintiffs' contention that the grievance process would not provide them with a final and binding decision. The fact that such review does not proceed to a National Review Committee does not mean that there is no final and binding decision. Additionally, as referenced above, Article 8, Section 1 does not prohibit damage awards, and nothing in the Rules of Procedure prohibit damage awards.

Plaintiffs' reliance on the Supreme Court's decision in *Clayton v. International Union*[44] is misplaced. That case addressed the following issue:

> [W]hether, and in what circumstances, an employee alleging that his union breached its duty of fair representation in processing his grievance, and that his employer breached the collective-bargaining agreement, must also attempt to exhaust the internal union appeals procedures established by his union's constitution before he may maintain his suit under § 301.[45]

---

[42] Doc. 65-1 at 46 (NMFA, art. 8, § 2(a)).

[43] *Id.*

[44] 451 U.S. 679 (1981).

[45] *Id.* at 682.

13

In discussing the union's internal grievance procedure, the Court distinguished that procedure from exhaustion of CBA grievance procedures.[46] In contrast to *Maddox* exhaustion, the Court "decline[d] to impose a universal exhaustion requirement lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy *internal union procedures* that may not be adequate to redress their underlying grievances."[47]

Whether a party is required to exhaust internal union procedures is discretionary, and the Court provided several factors to be considered.[48] In the context of applying these factors, the Court explained that if "an aggrieved employee cannot obtain either the substantive relief he seeks or reactivation of his grievance, national labor policy would not be served by requiring exhaustion of *internal remedies*."[49] Because Defendants move to dismiss here based on failure to exhaust the mandatory grievance process set forth in the NMFA, not internal union procedures, *Clayton* and the cases applying it to internal union grievance procedures are inapposite.[50]

### 2. Futility

Next, Plaintiffs allege that requiring them to exhaust would have been futile because Defendants would not have participated in the grievance process even if they filed one. A party may be excused from the grievance process in "the situation where the effort to proceed formally

---

[46] *Id.* at 687.

[47] *Id.* at 689 (emphasis added).

[48] *Id.* at 689–93.

[49] *Id.* at 693 (emphasis added).

[50] *Id.* at 695–96 ("In contrast to contractual grievance and arbitration procedures, which are negotiated by the parties to a collective-bargaining agreement and are generally designed to provide an exclusive method for resolving disputes arising under that agreement, internal union appeals procedures are created by the union constitution and are designed to settle disputes between an employee and his union that arise under that constitution.").

14

with contractual or administrative remedies would be wholly futile."[51]  However, even under the futility exception to exhaustion there is an attempt requirement.[52]  Plaintiffs fail to allege that they even attempted to follow the NMFA's grievance procedure.

Moreover, there is no authority that supports applying the futility exception under these circumstances.  Almost all of the cases dealing with futility involve suits brought by employees.  In that context, "[t]he test for 'futility' is not . . . whether the employees' claims would succeed, but whether the employees could have availed themselves of the grievance procedure."[53]  Here, the employer Plaintiffs claim that the Union Defendants intentionally breached the NMFA in order to drive Plaintiffs out of business, and that the Union Defendants refused to engage in the Article 6 CHOPS process.  But it is incorrect "that whenever a union makes a decision not to pursue a grievance to arbitration (perhaps erroneously, but without any breach of its duty of fair representation), this falls within the futility exception as defined in *Glover*."[54]  The futility exception exists "because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant."[55]

---

[51] *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969).

[52] *See Vaca v. Sipes*, 386 U.S. 171, 184–85 (1967) ("[I]t is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." (citation omitted)); *Parham v. Carrier Corp.*, 9 F.3d 383, 390–91 (5th Cir. 1993) ("[A]n employee may not simply assert that his use of grievance procedures would have been futile: he must ordinarily at least have *attempted* to use them." (footnote omitted)); *Anderson v. UAW, Loc. Union 31*, No. 89-2271-O, 1990 WL 58791, at *6 (D. Kan. Apr. 17, 1990) ("When a contractual grievance procedure is mandatory, an aggrieved employee must at least attempt to use and exhaust that procedure before seeking judicial review of her claim." (citing *Atkins v. Louisville & Nashville R.R.*, 819 F.2d 644, 649 (6th Cir. 1987))).

[53] *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1224 (11th Cir. 1985) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 659 (1965)).

[54] *Vera v. Saks & Co.*, 424 F. Supp. 2d 694, 706 (S.D.N.Y.), *aff'd,* 208 F. App'x 66 (2d Cir. 2006).

[55] *Glover*, 393 U.S. at 330.

Here, there are no allegations that the exhaustion process is controlled by the Union Defendants. The permanent National Grievance Committee is comprised of an equal number of employer and union representatives.[56] Plaintiffs allege that this is the same breakdown of control as the CHOPS committee, which Plaintiffs allege IBT's President "stopped in its tracks."[57] But the fact that Defendants allegedly did not engage in the CHOPS process in 2023 does not demonstrate that the grievance process that applies to this suit is "wholly futile," nor does it support the contention that Defendants "control" the grievance process.[58]

The leading Supreme Court case on futility, *Glover*, applied the futility exception to employees' race discrimination claims based on allegations that their union representatives were "acting in concert with" the employer "to set up schemes and contrivances" to bar black employees from promotions.[59] Under those circumstances, along with the fact that the employees made "repeated complaints to company and union officials," the futility exception to exhaustion applied.[60] Plaintiffs offer the Court no case law discussing the types of allegations that would be sufficient to establish futility by an employer plaintiff.[61] In fact, one court has

---

[56] Doc. 65-1 at 45 (NMFA, art. 8, § 1(b)); *see Goss Golden W. Sheet Metal, Inc. v. Sheet Metal Workers Int'l Union, Loc. 104*, 933 F.2d 759, 765 (9th Cir. 1991) (declining to find bias where the CBA "clearly provides that all appeals from unresolved grievances will be arbitrated by representatives of the Union and the local employers' association . . . . [the plaintiff] received exactly what it bargained for."); *Warren v. Int'l Bhd. of Teamsters*, 544 F.2d 334, 340 (8th Cir. 1976) ("The actions of such joint committees have consistently been considered just as final and binding as if the actions had been called arbitration." (citations omitted)).

[57] Doc. 65 at 21.

[58] *See* Doc. 30-3 at 6 (NGC Procedures, art. V) ("No Union or Employer representative shall serve in any capacity on a Committee or Panel provided for under these Rules in hearing a case in which they were directly involved, including hearing a case involving their own Local Union or Company.").

[59] *Glover*, 393 U.S. at 331.

[60] *Id.*

[61] *Cf. ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 728 F.3d 853, 861 (8th Cir. 2013) (finding that employer could not demonstrate futility of exhaustion where the applicable grievance rules offered a means of modifying the grievance resolution process). *Lerwill v. Inflight Motion Pictures, Inc.*, cited by Plaintiffs, does not apply the futility exception to *Maddox* exhaustion. 582 F.2d 507, 511 (9th Cir. 1978). The court explained in *Lerwill* that there was no specific grievance process provided under the CBA that the plaintiff was required to exhaust. *Id.* Its futility analysis instead focused on whether it would be futile for the "*employees to seek union*

noted that since *Glover*, "the futility exception has been largely limited to situations where the operation of bias or prejudice renders any attempts to resort to contractual remedies useless, and does not apply to situations where the union decides not to pursue a grievance in the appropriate exercise of its discretion."[62] Futility cannot be based solely on a subjective belief "that resort to those procedures would be a hollow act."[63] Therefore, even if Plaintiffs sufficiently alleged that they attempted to grieve their claims, the Court finds insufficient allegations to support Plaintiffs' assertion that pursuing the grievance process was wholly futile.

Because the Court finds that Plaintiffs failed to exhaust the grievance process under the terms of the NMFA before bringing their LMRA claims in this case, and because no exception to the grievance requirement applies, Defendants' motions to dismiss must be granted.[64]

## IV. Request for Leave to Amend

---

*assistance*." *Id.* (emphasis added). Likewise, Plaintiffs' citation to *Prism Electrical Contractors, Inc. v. International Brotherhood of Electrical Workers Local 82* is unavailing. In that case, the employer plaintiff failed to exhaust the grievance procedures under the CBA, and argued it was excused due to the union's repudiation—a different exception to the exhaustion requirement. No. 03CV240, 2007 WL 9734403, at *3–4 (S.D. Ohio Sept. 11, 2007). The court found insufficient evidence on summary judgment to support the repudiation exception to the exhaustion requirement. *Id.* at *4.

[62] *Vera v. Saks & Co.*, 424 F. Supp. 2d 694, 707 (S.D.N.Y.), *aff'd,* 208 F. App'x 66 (2d Cir. 2006) (collecting cases); *see also Parham v. Carrier Corp.*, 9 F.3d 383, 391 (5th Cir. 1993) (distinguishing *Glover* because "there is no evidence that any racial animus pollutes the instant case. Neither is there evidence that the representatives of [the plaintiff's] Union who would participate in the grievance procedures would be selected by [the employer], which is the real target of [the plaintiff's] complaint."); *Bautista v. Pan Am. World Airlines, Inc.*, 828 F.2d 546, 552 (9th Cir. 1987) ("*Glover* was not predicated on mere disagreement between the employees and the union on the merits of a grievance, but on the fact that the Adjustment Board, according to the plaintiffs' allegations, would have been infected with racial bias. Ours is a case of legal disagreement, not one of invidious discrimination or unjustified hostility.").

[63] *Parham*, 9 F.3d at 392.

[64] Plaintiffs suggest that staying this matter is the "better remedy." Doc. 65 at 12. But because the Court finds that Plaintiffs failed to allege that they exhausted, or even attempted to exhaust, the grievance process under the NMFA, they were barred from bringing their breach-of-contract claims alleged in the Amended Complaint in this Court; therefore, the claims must be dismissed. *See, e.g.*, *Robinson v. Wash. Metro. Area Transit Auth.*, 167 F. Supp. 3d 118, 136 (D.D.C. 2016).

In a footnote, Plaintiffs request leave to amend if the Court decides to grant the motions to dismiss.[65]  But Plaintiffs failed to separately move for leave to amend addressing the factors that the Court must consider,[66] nor did they submit a proposed amended pleading for the Court's review,[67] nor did they explain how they could amend their pleading to cure their failure to exhaust.  Accordingly, the Court denies Plaintiffs' footnoted requests for leave to amend.

**IT IS THEREFORE ORDERED BY THE COURT** that IBT and TNFINC's Motion to Dismiss (Doc. 29), and the Local Unions' Motion to Dismiss (Doc. 31) are **granted**.  This case is hereby dismissed in its entirety without prejudice.

**IT IS SO ORDERED.**

Dated: March 25, 2024

                                                 S/ Julie A. Robinson
                                                 JULIE A. ROBINSON
                                                 UNITED STATES DISTRICT JUDGE

---

[65] Doc. 65 at 10 n.3; Doc. 66 at 5 n.3.

[66] *See Duncan v. Manager*, 397 F.3d 1300, 1315 (10th Cir. 2005) (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)).

[67] *See* D. Kan. R. 15.1.